**In the Interest of A.M.S., a minor child,**

**A.M., Natural Mother, Appellant.**

No. 86–1542.

Supreme Court of Iowa.

Feb. 17, 1988.

James W. Cleverley, Jr., of Diehl, Clayton, Cleverley & Williams, Newton, for appellant.

Thomas J. Miller, Atty. Gen., Valencia Voyd McCown, Asst. Atty. Gen., and James R. Wilson, Asst. Co. Atty., for the State.

Gerald B. Feuerhelm, guardian ad litem, Des Moines, for the child.

Considered by McGIVERIN, C.J., and HARRIS, SCHULTZ, LAVORATO, and ANDREASEN, JJ.

LAVORATO, Justice.

This case is an appeal by the mother, Alice, from a juvenile court decree terminating the parent-child relationship between her and her four-year-old daughter, April.[1] We originally transferred this case to the court of appeals, which reversed the juvenile court's decree. On further review, we now vacate the court of appeals decision and affirm the decree of the juvenile court.

I. On April 14, 1986, April's attorney initiated this proceeding by filing a petition pursuant to Iowa Code section 232.111 (1985)[2] to terminate Alice's parental rights to April. The petition is grounded on section 232.116(5), which authorizes termination when the court finds that

a. The child has been adjudicated a child in need of assistance pursuant to section 232.96; and

b. The custody of the child has been transferred from the child's parents for placement pursuant to section 232.102 for at least twelve of the last eighteen months; and

c. There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102.

The Iowa Department of Human Services filed a child in need of assistance petition regarding April on April 1, 1985. *See* Iowa Code § 232.87. On April 19 the juvenile court adjudicated April to be a child in need of assistance. *See* Iowa Code

---

1. The court also terminated the natural father's parental rights. He has not appealed.

2. Unless otherwise indicated, all references are to the 1985 Code.

§ 232.96. Hence, the first condition described in section 232.116(5)(a) is satisfied.

On May 13 the court transferred custody of April to the department for foster care placement. *See* Iowa Code §§ 232.99, 232.-102(1)(c). Because the court transferred custody eleven months before the petition to terminate was filed, Alice contends the twelve-month condition in section 232.-116(5)(b) is not satisfied. Consequently, Alice argues, the court on October 1, 1986, had no jurisdiction to terminate Alice's parental rights to April following a termination hearing on September 19.

■ We rejected the same argument in *In re J.L.H.*, 326 N.W.2d 284 (Iowa 1982). There is no jurisdictional requirement that the twelve-month period must pass before the petition to terminate is filed. *Id.* at 286. The twelve-month period begins to run on the date the court transfers custody and continues to run until the termination hearing. *Id.* If the evidence at the hearing shows that the twelve-month period has passed, that is sufficient. *Id.* Here, the evidence at the termination hearing shows that the court transferred April's custody to the department approximately sixteen months before the hearing. Contrary to Alice's contention, we think the twelve-month condition in section 232.116(5)(b) is satisfied.

What is left for us to decide is the single but difficult issue whether there is clear and convincing evidence that April cannot be returned to her mother's custody, as provided in section 232.102. *See* Iowa Code § 232.116(5)(c). Central to our determination here is section 232.102(3), which provides in pertinent part:

> Whenever possible the court should permit the child to remain at home with the child's parent.... Custody of the child should not be transferred unless the court finds there is clear and convincing evidence that:
> 
> ....
> 
> b. The child cannot be protected from some harm which would justify the adjudication of the child as a child in need of assistance....

Thus, the requirement of section 232.-116(5)(c) is met when the child cannot be returned to the parental home because the definitional grounds of a child in need of assistance, Iowa Code § 232.2(6), exist. *In re K.L.C.*, 372 N.W.2d 223, 227 (Iowa 1985).

■ Pertinent to our determination here are the following definitional grounds of a child in need of assistance:

> *"Child in need of assistance"* means an unmarried child:
> 
> ....
> 
> b. Whose parent ... has physically abused or neglected the child, or is imminently likely to abuse or neglect the child.
> 
> c. Who has suffered or is imminently likely to suffer harmful effects as a result of:
> 
> (1) Conditions created by the child's parent ... or
> 
> (2) The failure of the child's parent ... to exercise a reasonable degree of care in supervising the child.
> 
> ....
> 
> e. Who is in need of medical treatment to cure, alleviate, or prevent serious physical injury or illness and whose parent ... is unwilling or unable to provide such treatment.
> 
> ....
> 
> g. Whose parent ... fails to exercise a minimal degree of care in supplying the child with adequate food, clothing or shelter and refuses other means made available to provide such essentials.

Iowa Code § 232.2(6). Proof by clear and convincing evidence of any one of the above types of harm is sufficient to support termination. *See In re K.L.C.*, 372 N.W.2d at 228. In addition, contrary to Alice's contention, the court is not limited at the termination hearing to determining whether the facts found at the adjudication hearing still exist twelve months later. The proof must only show that any of the alleged definitional grounds of a child in need of assistance in section 232.2(6) exist at the time of the termination hearing. *See id.;* Iowa Code § 232.102(3)(b).

II. Previously enunciated principles pertinent to our appellate review here bear repeating:

Appellate review of proceedings to terminate a parent-child relationship is de novo; thus "it is our duty to review the facts as well as the law and adjudicate rights anew on those propositions properly preserved and presented to us." We accord weight to the fact-findings of the juvenile court, especially when considering the credibility of the witnesses whom the court heard and observed firsthand, but we are not bound by those findings.

Central to a determination of this nature are the best interests of the child. In this connection we look to the child's long-range as well as immediate interests. Hence, we necessarily consider what the future likely holds for the child if returned to his or her parents. Insight for this determination can be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care that parent is capable of providing.

*In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981) (citations omitted). We have also recognized that our statutory termination provisions are preventive as well as remedial. *Id.* They are designed "to prevent probable harm to a child and do not require delay until after harm has occurred." *Id.*

III. With these principles in mind, we turn to the record to determine whether there is clear and convincing evidence that April will suffer any one of the harms specified in section 232.2(6)(b), (c), (e), and (g) if she is returned to the custody of her mother.

Alice is twenty-six years of age. She has an I.Q. of seventy-five and, thus, is mentally disabled. According to a psychiatrist who evaluated Alice, she suffers from an "intermittent explosive disorder." People suffering from such a disorder experience anger that is out of proportion to the stimulus causing it. They also have a history of striking others or destroying property when experiencing an explosive episode. If such a person is a parent, he or she might harm a child with inappropriately harsh discipline.

Alice's family moved to Iowa from Arkansas in 1975. The Iowa Department of Human Services first came into contact with Alice in 1977 when, at the age of sixteen, she was removed from her parental home and placed in foster care because she had been sexually abused by her father. Four years later she left the foster home after becoming pregnant.

Thereafter, Alice lived with relatives until shortly after April was born on June 24, 1982. After April's birth, her natural father, Danny, lived with Alice and April for several weeks. Since then he has had no further contact with either one. Alice and Danny were never married.

Shortly after April was born, the Department of Human Services began providing Alice with homemaking services. The homemaker health aide visited Alice's home three days per week. The aide instructed Alice on child care, hygiene, cooking, and money management. These services continued until November 1985, at which time Alice terminated them.

From the aide's testimony at the termination hearing we learn that Alice's care of April was deficient. The baby suffered from diaper rash and was not kept clean. The rash became so severe at times that the baby would bleed. According to the aide, Alice was unable to comprehend the fragileness of a baby and how some childhood illnesses and conditions could affect a child's overall health.

The aide described the unsanitary conditions to which the baby was exposed. Dirt was allowed to accumulate on the floor. Many times the aide would find vomit as well as bottles with sour milk in the baby's crib. At times the aide would arrive at the home and find the baby's diaper soaked and full. Constant prodding by the aide to correct these conditions had no effect on Alice.

The aide on occasions would find it necessary to instruct Alice to seek medical treatment for the child. Alice was less than consistent in administering medication to the child. She would do so at her conve-

nience or if she remembered. For example, at times Alice would forget to put ointment on the diaper rash or to give the child antibiotics for a chronic ear infection.

In March 1983 Alice met and began living with Tom. Several months later Alice asked Tom to leave because of his drinking. In February 1984 Alice bore Tom's child, Crystal. According to the homemaker health aide, Alice's parental skills did not improve with the arrival of her second child.

Alice began experiencing a good deal of stress in caring for the two children. There were a number of substantiated child abuse reports. For example, on at least two occasions April suffered cuts and cigarette burns. Because of these reports, the Department of Human Services in August 1984 referred Alice to Susan Gauger, a clinical social worker employed by the county mental health center. The purpose of the referral was to assess Alice's parental skills and to develop a treatment plan to improve them.

A month after the referral, Alice acknowledged that she could not cope with the stress of caring for two children. After an incident in which Alice struck April in the eye, she called the department and agreed to place the child in foster care, where the child has since remained.

A short time later, Gauger referred Alice to a psychologist for testing to determine whether Alice was capable of performing adequately as a parent. The psychologist determined that Alice's level of intellectual functioning fell in the borderline range. In addition, the psychologist reported that Alice misinterprets reality. The psychologist noted that this shortcoming might cause Alice to "miss the significance of a situation that she is in and respond in a way that is not appropriate to the needs of a child."

Overall, the psychologist opined that these characteristics would limit Alice's ability to function as a parent. Even with these limitations of intellectual functioning and personality characteristics, the psychologist felt that with a heavy schedule of supervision and therapeutic contact Alice might be capable of developing parental skills. The psychologist warned, however, that Alice's potential for making positive changes to develop parental skills was limited. To succeed Alice would need a great deal of motivation and desire to rear her children.

The same psychologist wrote in April 1985:

[Since my evaluation in September 1984] Alice has been offered extensive services. I was present at a meeting where current concerns about her functioning and her daughters' needs and safety were discussed. Those services have not produced any consistent improvement in her functioning as a parent. She is not capable of providing adequately for even the most basic needs in terms of food, clothing and shelter. It seems unlikely that continued service will result in improvement.

In the same month Tom returned to the home, and he married Alice the following June.

Following up on the psychologist's recommendations, Gauger initiated in-home counseling sessions on a weekly basis. These sessions dealt with parental issues and included individual counseling with Alice, marital counseling with Alice and Tom, and some individual counseling for Tom. At least forty-seven of these counseling sessions were conducted with April present. At these times Gauger would pick up the child from the foster home and transport her to Alice's home. These counseling services were still being provided at the time of the termination hearing some two years later. In all, Gauger had 201 hours of contact with the family unit during this two-year period.

In addition, during this two-year period Gauger sought the opinion of three child psychiatrists. Her purpose in doing so was to determine whether she was doing everything possible to help Alice maintain custody and control of April. All three psychiatrists thought Gauger's treatment plan was extensive and well done.

In February 1986 Gauger wrote:

In working with [Alice] for the last year and a half she has the communication skills of an eight- to ten-year-old and the socialization skills of a seven- to ten-year-old. Generally as an individual she is only able to provide bare minimum care for herself and ... Crystal. If it weren't for the presence of her husband [Tom], I am not sure she could even consistently provide that.... Extensive intervention has been provided to this family. Progress has been minimal to none. While Tom has more motivation and [has] shown more cooperation, Alice has remained basically unmotivated and has failed to follow through on almost all recommendations made to her.... [M]y professional observations and instincts tell me that Alice may never be able to care for her children appropriately despite constant intervention and the amount of supervision given to her.

In September, two days before the termination proceedings, Gauger summarized her efforts over the past two years in a report. In that report she again noted that the family had made "minimal progress toward improving the home's physical and emotional environment." What gains were made, Gauger observed, had occurred since Tom returned to the home. Although acknowledging that Alice had made some progress in home care and meal preparation, Gauger described Alice's efforts in these areas as "not consistent along minimally acceptable standards."

The following excerpts from Gauger's report continued to paint a dismal picture of Alice's parental abilities even after intensified in-home counseling:

Alice remains very impulsive and continues to lack minimal ability to nurture. She has made no gains in learning basic nurturing. She views the world and her problems unrealistically.... Her responses to outside stimulus or pressure is often inappropriate and makes for poor role modeling for her daughters. Due to the fact that Alice has been unable to make gains in controlling her own impulses, it is unlikely she can teach her children to control theirs. This has continued to be a problem with April and Crystal.

. . . .

Minimal interaction continues to occur between Alice and the children. They are virtually ignored, left to follow their own impulses.... They are left to play on their own and supervision remains a serious problem.

Alice's continued motivational difficulties remain a serious consideration. Alice has become more and more inactive. It is difficult for her to motivate at all now. She spends a great deal of time sleeping during the day and staying up late at night. She shows little motivation to engage in play activity or discipline with the children. When the children seek out Alice's attention, she frequently yells at them to get away. When she talks to them, it is in a yelling tone of voice and the children are frequently startled or jump when she addresses them.

. . . .

We are virtually at the same place we started at in 1984. A helpful resource has been Tom, but even his efforts have failed to help Alice develop into a more acceptable, adequate parent.

Gauger goes on in the report to recommend termination of Alice's parental rights to April.

Several months before Alice voluntarily placed April in foster care, the department referred April to the Area Education Agency. April was two years old at the time. Brenda Marie Parker, a preschool handicap consulting teacher with the Area Education Agency, began working with April through a home intervention program. The program is designed to help parents plan appropriate activities to help their children master some skills the children are lacking. Those skills are identified through testing. In April's case, testing showed that April was experiencing delay in speech and language.

In the short time before Alice placed April in foster care, Parker worked with both in their home. When asked to participate in the teaching exercise, Alice was

more interested in watching television. On some occasions Parker would arrive at the home and find Alice still in bed. In addition, Alice failed to follow through with Parker's directions to chart April's progress in the various activities Parker covered. Without such information Parker had no way of judging how well April was doing. Parker also worked with Alice and April after the foster care placement. At those times April would be brought to the home for the sessions.

In the fall of 1985 April was enrolled in a preschool program for handicapped children sponsored by a local elementary school. As part of the program, April attends half-day classes year-round. Since April's enrollment, Jill Bartello, a teacher in the program, has been working with April on a daily basis.

From Bartello's testimony we learn that April is functioning below her age level in almost every area of development. Her primary problem is speech and language. April not only has problems understanding what she hears but also in expressing herself. April usually speaks in one-, two-, or three-word phrases. Her cognitive and fine motor skills are also below her age level. In short, April has a mental disability. Bartello's teaching is directed at improving April's fine motor skills, gross motor skills, cognitive skills, speech and language, and behavior.

As part of this program Bartello has constant contact with April's foster parents. Those contacts are in the form of a notebook passed between teacher and parents on a daily basis. Bartello writes comments in the notebook about what April has done in school, how well she is performing, and what concerns Bartello has. The foster parents respond by informing the teacher each day of any significant events in April's life that might be affecting her. For example, the foster parents have told Bartello that April has seizures and takes Dilantin to control the seizures. Bartello has also learned from these foster parents that April has a hearing problem. Knowledge of April's medical problems has prompted Bartello and the other instruc-

tors to monitor April closely for signs of seizures and for signs of any inability to hear what is being said to her.

According to Bartello, the parental stimulus outside of school that is provided by the foster parents has been important in helping April improve her skills and behavior. The foster parents have been reinforcing at home the very things taught in the classroom. As a result, April has shown marked improvement in all these areas.

Without the parental stimulus, Bartello feels the help April gets through school would need to be much more intense. Moreover, Bartello noted that April would probably need some kind of special help through much of her schooling. With such help, Bartello believes that April could make it through high school.

Prior to the termination hearing, Bartello had no contact with Alice. Hence, she could give no opinion whether Alice would provide the parental stimulus and reinforcement at home to help April.

Parker, who did have such contact, thinks that April was benefiting from participation in the special preschool class and feels that the schooling should continue. Based upon past experience, Parker believes that Alice would make only minimal efforts to reinforce at home what April learns in the classroom. In Parker's view April must receive more reinforcement than Alice would give her to develop the educational skills she needs. Parker pointed out that the foster parents, in contrast, are very willing to do anything that is suggested to help April.

Parker testified she foresees no significant improvement in Alice's ability to provide for April. Consequently, she would not recommend removing April from foster care even on a short-term basis.

In addition to her mental disability, April has significant medical problems. She began having seizures while she was still living with Alice. The seizures continued after April's removal to foster care. During the seizure spells, the pupils in her eyes dilate, her fists clench, her head nods, and her eyes roll up. At other times, April has

a blank stare and does not respond appropriately to questions.

Because of these seizures, the foster parents took April to Dr. Mark Thoman, a pediatrician. In view of the history of seizure activity, Dr. Thoman referred April to Dr. Thomas W. Kelly, a child neurologist. Both doctors first saw April in December 1984 and have continued to treat her, Dr. Kelly for the seizure disorder and Dr. Thoman for ordinary childhood illnesses. Both agree that April is mentally disabled and slow in development. They pointed out that unless April is stimulated by her caretakers she will show significant delays in learning.

Both doctors emphasized that caretakers must monitor a child who suffers from a seizure disorder. Such a child, they suggested, may fall and suffer serious injury during a seizure. Because infections can trigger seizures, such monitoring becomes very important when the child is sick. In addition, normal activities such as bathing require extra care. A child prone to seizures should not be left alone in a bath because of the danger of the child drowning if a seizure does occur.

Dr. Kelly underscored the importance of close monitoring in April's case when he described how, at the beginning of her treatment, the medication he prescribed increased in April's system to a toxic level. He pointed out that had the foster parents not been alert and sought immediate medical attention for April, she might have suffered permanent injury.

According to April's doctors, her present foster parents continue to provide close monitoring of April. Consequently, the doctors see April frequently, and her condition is good. Although seizures do occur despite the medication, they are not as frequent and as severe as they were at the beginning of treatment.

Dr. Kelly's prognosis stresses the importance of April's receiving extra attention not only at home but also at school. Despite success with the medication, April continues to suffer seizures. She has not been seizure-free for more than a month or two. Consequently, Dr. Kelly expects to see her frequently over the next several years to supervise her medication. He foresees that as April gets older he may have to alter not only the dosage level, but also the type of medication. Hence, he considers a good medical history from April's caretakers essential in these circumstances.

Dr. Kelly described April as a child who requires a great deal of extra attention and special care, a child who has to be dealt with medically as well as emotionally in a fairly sophisticated way. Because of Alice's limited capabilities, he expressed strong concerns about her ability to understand the special needs of a mentally disabled child who suffers from a seizure disorder.

The department filed the child in need of assistance petition in April 1985 only after it was convinced Alice would not meet the standards required of her. Shortly after Alice had placed April's custody with the department in September 1984, she entered into various agreements with the department to avail herself of numerous services to help her regain custody of April. These agreements were in lieu of court action to adjudicate April to be a child in need of assistance. The department made it clear to Alice that if she failed to meet the standards required of her, the department would seek court action on April's behalf.

When the department did move, it filed a joint petition on behalf of both children. Alice stipulated to the allegations in the petition. The juvenile court then adjudicated both children as being in need of assistance, basing its adjudication on sections 232.2(5)(c)(2) and 232.2(5)(g) (1983).[3] The social worker who observed the conditions in the home leading to the filing of the petition testified:

Q. What types of ... unsanitary conditions were you specifically referring to when that petition was filed? A. At that time we were talking about dirty

---

3. Iowa Code § 232.2(5)(c)(2) (1983) has been renumbered § 232.2(6)(c)(2) (1985) and § 232.2(5)(g) (1983) has been renumbered § 232.2(6)(g) (1985).

dishes being left around and the resulting factor of [having] bugs in the house, cockroaches; food not being properly stored. There were bottles with sour milk within ... Crystal's access, and we were fearful that she would have or did get ahold of those, and they had the potential of making her ill. There were small objects such as cigarette butts and tacks and things on the floor that the kids could and did pick up and put in their mouths.

There was a problem with bug ... poison[ ] being on the floor within the children's reach....

The ... dirty wet diapers were not disposed of properly and were at a place where the kids could get to them. The sheets on the bed were often not changed when they became soiled by urine or just dirty in general. The carpets ... weren't clean.... There were a lot of things that the kids could get their hands onto and get into their mouths.

The court additionally found that "Crystal has failed to develop properly physically while in the mother's care and has been diagnosed as a 'failure to thrive.' "

After adjudicating April and Crystal to be children in need of assistance, the court placed both children in the temporary custody of the department for placement in a licensed foster home. *See* Iowa Code § 232.96(9), (10) (1983). The court then ordered that both children reside with April's foster parents until a disposition hearing could be held.

The next month, following the disposition hearing, the court placed Crystal in the custody of Tom, her natural father, under the protective supervision of the department. *See* Iowa Code §§ 232.99, 232.101(1) (1983). The court ordered that April remain in the custody of the department and remain in the foster home where she had resided since September 1984. *See* Iowa Code §§ 232.99, 232.102(1)(c) (1983). The court also retained jurisdiction for eighteen months and ordered review of the matter in six months unless requested sooner by any of the parties. *See* Iowa Code § 232.102(6) (1983).

After the hearing, Alice saw April in Alice's home under the supervision of the department just as she had been doing before the hearing. In October 1985 the court cut off Alice's visitation with April on the written recommendation of Dr. Thoman. The doctor informed the court that April's seizures had increased after visitation with her mother.

Alice's visitation was reinstated in November, but shortly thereafter April's doctors again intervened, suggesting to the child's attorney that visitation be discontinued. The court again cut off visitation. In response to Alice's application, the court in December appointed Rex Shahriari, a psychologist, to evaluate April to determine whether Alice's visitation with April triggered the child's seizures.

Shahriari reviewed court documents and information provided by the department, and conducted psychological testing and a clinical evaluation of Alice and April. He was present in Alice's home for several hours when April visited her mother, Tom, and Crystal. In addition, Shahriari interviewed April's preschool teacher, consulted with a psychiatrist who had examined Alice earlier, and obtained information from a physician's assistant employed by Dr. Thoman.

In March 1986 Shahriari submitted a detailed report to the court. Although Shahriari was not able to substantiate any cause-effect relationship between home visits and seizure activity, he did render the following opinion and recommendation:

[I]t is my opinion and recommendation that April ... remain in the custody of the Department of Human Services. It is further my opinion and recommendation that the parental rights of Alice ... be terminated as the likelihood of her being able to meet the needs of April is minimal, and in order [for] April to develop her potential to the fullest she will need parents who are capable and willing to meet her needs. In light of her developmental delays and the seizure disorder, her needs will be such that even normally functioning parents would have difficulties. It is further my opinion and

recommendation that prospective adoptive parents be made fully aware of April's limitations and needs. She should be placed with parents who are supportive and caring, and willing to accept the fact that April is likely to continue to have lifelong problems requiring care and attention. Currently April is a beautiful and delightful child; however, as she grows into adulthood her handicaps will become more apparent.

The next month April's attorney, following up on Shahriari's recommendation, filed the petition to terminate Alice's parental rights to the child.

At the termination hearing April's foster parents described their experiences with her during the two years she has lived in their home. April was brought to them in the middle of the night. They knew very little about her. She had a black eye, bruises, and an unhealthy look.

In the beginning April was hyperactive, withdrawn, and uncooperative. She cared very little about her personal hygiene and appearance. She could not talk. Now she enjoys playing with other children and tries to keep herself neat and clean. She can speak, sometimes spontaneously, in sentences of four and five words.

The foster parents recognize that April's seizure disorder has a wide spectrum ranging from dilation of the pupils of the eyes accompanied by a blank stare to body stiffness and incoherency. Medication has helped to control the seizures, and at times a simple suggestion to close her eyes and sit calmly will bring April out of a seizure.

Because April is somewhat overweight, she is on a diet. Being overweight can aggravate the seizure disorder. The diet requires preparation of two separate meals, one for April and one for the rest of the family.

Having learned that any type of change or stress may trigger a seizure, the foster parents have April on a schedule that emphasizes routine. Common childhood illnesses are particularly troublesome because they can quickly trigger a seizure. As the foster mother succinctly said, "With fever everything seems to go." Consequently, with the first sign of illness, medical attention is quickly sought.

Over the past eight years April's foster parents have cared for seventy children placed in their home by state officials. Both parents noted that out of all the children, April has required the most supervision, the most time, and the most attention. For fear of losing any previous gain made, these parents constantly work with April to teach her to talk and to do the simple self-help tasks like putting on a jacket. They read to her, and teach her to count and to recognize colors. They are in daily contact with her teachers via the notebook and sometimes the telephone about her activities at school and at home, her successes, and her setbacks.

Although the foster parents have expressed a desire to adopt April in the event of termination of parental rights, they recognize their duties as foster parents and stand ready and willing to play whatever role the court would ask of them. If they are permitted to adopt, both parents recognize they may be taking on a financial, emotional, and physical burden that may very well last beyond April's childhood.

At the time of the termination hearing, Alice, Tom, and Crystal were living together. Alice and Tom expressed a desire to have April back in their home. Tom insisted that since he has been in the home, Alice's attitude and the conditions in the home have improved. Though the evidence supports Tom to some extent, the observations Shahriari made in his visit to the home in March 1986 are inconsistent with Tom's testimony:

> There were a number of physical features that were disquieting. There were matches, lighters, and full ashtrays in several locations readily accessible to children. A rocking horse was positioned in front of a glass window where the risk of a child falling through the glass was present.... Alice sat and watched passively as Crystal picked up a small button off the floor and placed it in her mouth. She did not react when April got on the above-mentioned rocking

horse. No attempt was made by Alice or Tom to remove some of the small objects which were about the house.... What was disquieting was the minimal amount of nurturing and attention paid to [April] by her mother....

Moreover, Tom testified that a typical day would find him getting up, getting Crystal dressed, and fixing her breakfast while Alice stayed in bed.

The most telling part of Tom's testimony came in this exchange:

Q. How do you view your current relationship with Alice as far as your marital relationship? A. Oh, we have our ups and downs like any other married couple do.

Q. Just for instance, if you were to get divorced, would you want to keep Crystal—A. Yes, I would.

Q. —in your possession? Would you feel comfortable with Alice retaining Crystal? A. I don't know if I would or not. I would have to cross that bridge when [I] came to it.

This candid expression of a lack of confidence in Alice's parental ability underscores what the social workers, psychologists, and doctors have been saying for two years.

Alice's inaction in seeking needed medical attention for herself belies her claim that she could meet the special needs of April in the future. In the year before the termination hearing, Alice repeatedly refused to seek medical attention on her own for a serious chronic bladder infection. A social worker had to intervene and take her to the doctor. When questioned about her reluctance to seek medical attention she inappropriately responded: "[The doctors] do nothing for it. They keep giving me medication, and it's hard for me to swallow medication. I could choke on it, and I don't like the taste of liquid ... I do go to the doctor when it gets so bad, I can't stand it."

Alice displayed the same attitude toward Crystal's medical needs. On one occasion the child was vomiting, had diarrhea, and was feverish. Alice's social worker testified it was obvious the child was in need of immediate medical attention. Again the response was inappropriate: the family decided to wait until the next day to see if the child still felt bad.

Alice conceded she would need numerous services, including homemaking assistance, with April in the home. Although she candidly admitted she does not like the idea, she grudgingly agreed to cooperate and accept the help if the court so ordered. She terminated homemaking services for no good reason in November 1985. The department thought those services were necessary to correct some of the problems in the home. Alice's termination of needed services and her expressed feelings about accepting them belie her claim that she would cooperate with the department in any suggested treatment plan for April.

It is clear from the evidence that Alice relies heavily on Tom for the care of Crystal and their home and would continue to rely on him with April in the home. It is also clear that the couple's marriage is not on solid ground. We have already mentioned Tom's lack of confidence in Alice's parental ability. Alice, likewise, has expressed disturbing things about their relationship. For example, on several occasions she has said she only married Tom to help her regain custody of April. She has also said she would rather be married to April's father than to Tom.

■ IV. If we were to return April to Alice, we think the evidence is clear and convincing that April could not be protected from the harms described in section 232.2(6)(b), (c), (e), and (g). Although we agree with the court of appeals that the mental disability of a parent is not a sufficient reason alone for the termination of parental rights, we believe the evidence in this case shows far more than just the mental disability of a parent.

We said in *In re Wardle*, which the court of appeals cited, that a parent's mental disability alone is not a sufficient reason for termination. 207 N.W.2d 554, 563 (Iowa 1973). But we also said there that such a disability "is a proper factor to be considered in determining whether the

child is neglected to the point" at which termination is necessary to serve the child's best interests. *Id.* This necessity arises when the disabled parent lacks the capacity to meet the child's present needs as well as the capacity to adapt to the child's future needs. *Id.* We are faced with just such a situation here.

In contrast to the bright, healthy, and self-reliant child whom we returned to her mentally disabled mother in *Wardle, id.* at 559, 564, April has a mental disability and significant health problems. Consequently, she has special educational and medical needs. Her problems demand parents with exceptional parental skills who will not only provide April with adequate food, clothing, and shelter, but will also give her the special love, nurturing, support, attention, close supervision, patience, and appropriate discipline she will need to survive and function.

This is not a case like *Wardle,* in which well-intentioned people wanted an already bright and self-reliant child to have a chance to develop her full potential in a more affluent home. *See Wardle,* 207 N.W.2d at 564. In April's case it is a matter of survival and learning to function in society. Her plight is more akin to that of the two-year-old brother in *Wardle.* We did not return the brother to the home because we did not think the mother had improved her parental skills enough to meet the child's physical needs. *Wardle,* 207 N.W.2d at 562–63. Similarly, because of Alice's performance over the past several years, we do not think it likely that she will improve her parental skills to meet April's special needs. Even with Tom's presence in the home, which is not guaranteed, we are not as convinced as the court of appeals that April's special needs will be met.

We also agree with the court of appeals that siblings should not be separated without good and compelling reasons. Unlike the court of appeals, however, we find from the record that there are such reasons. Crystal does not have a mental disability nor does she have April's medical problems. Crystal is thriving and is appar-

ently healthy and of normal intelligence. Obviously, Crystal can survive and function with much less care and attention than April requires. *Cf. Wardle,* 207 N.W.2d at 563–64.

In addition, the sisters have not lived together for any significant period. Consequently, the record reveals no strong attachment between them.

Finally, given Alice's past performance as a parent and the ostensible instability of the marriage, we, like the social workers who testified, are not completely satisfied that Alice and Tom will continue to meet even Crystal's needs.

The social workers have worked long and hard in an obviously unsuccessful attempt to improve Alice's parental skills. Unfortunately, the improvement did not happen. Nor do we believe it is going to happen. We fear precious little time remains before April loses any real chance to be adopted. April should have that chance.

For all the reasons discussed, we think the juvenile court was correct when it terminated Alice's parental rights to April. Accordingly, we vacate the decision of the court of appeals and affirm the decree of the juvenile court.

DECISION OF COURT OF APPEALS VACATED; DECREE OF THE JUVENILE COURT AFFIRMED.