# IN THE COURT OF APPEALS OF IOWA

No. 16-1680
Filed January 25, 2017

**IN THE INTEREST OF K.P., S.P., and I.D.,**
**Minor children,**

**J.B., Mother,**
        Appellant.

_____

        Appeal from the Iowa District Court for Polk County, Joseph W. Seidlin, District Associate Judge.


        The mother appeals from the order terminating her parental rights to three of her children. **AFFIRMED.**


        Justin A. Montello of J. Montello Law P.L.L.C., West Des Moines, for appellant mother.

        Thomas J. Miller, Attorney General, and David M. Van Compernolle, Assistant Attorney General, for appellee State.

        Michelle R. Becker of Youth Law Center, Des Moines, attorney and guardian ad litem for minor children.


        Considered by Vaitheswaran, P.J., and Potterfield and Bower, JJ.

**POTTERFIELD, Judge.**

The mother appeals from the termination of her parental rights to three[1] of her children: I.D., who is six years old, and K.P. and S.P, who are both three years old.[2] The mother maintains the statutory grounds for termination were not proved by clear and convincing evidence, the Iowa Department of Human Services (DHS) failed to make reasonable efforts to reunify the mother and the children, termination was not in the best interests of the children, and the court should have found that a permissive factor weighed against termination of her parental rights. Additionally, the mother claims she received ineffective assistance from her initial counsel and the trial court abused its discretion in overruling her motions and written objections.

**I. Background Facts and Proceedings.**

In May 2015, the mother and the children were with the mother's boyfriend[3] at a birthday party for the boyfriend's one-year-old relative. The boyfriend became intoxicated and began fighting with a number of his family members; he eventually left, driving away from the party with the mother and the children in the vehicle. The boyfriend returned later—apparently intending to

---

[1] The mother also has a daughter, S.T., who was eleven at the time of the termination hearing. The daughter was living with the mother at the time of removal and was originally part of the proceedings, but before the State filed the petition to terminate the mother's rights, the daughter, with the approval of the Iowa Department of Human Services (DHS), went to live with her biological father out of state. The mother's rights to S.T. were not terminated. Additionally, the mother gave birth to another child in May 2016, and that child was not a part of the termination proceedings.

[2] The father of K.P. and S.P. filed a timely notice of appeal but then failed to file his petition within the allotted fifteen days. *See* Iowa R. App. P. 6.201(1)(b). He filed a motion requesting additional time to file his brief, but our supreme court denied the request. *Id.* ("The time for filing a petition on appeal shall not be extended."). The parental rights of I.D.'s father were also terminated. He does not appeal.

[3] The boyfriend is the father of the mother's youngest child—a child not at issue in these proceedings.

fight more family members—with the children and the mother, who was noticeably injured. The police were called, and a report was made. The police report indicates the mother stated the boyfriend had punched her multiple times, landing blows on her neck, face, and shoulder while he was driving. The officer reported the mother's left eye was bruised and swollen shut, her upper lip had a minor laceration, her left shoulder was bruised and swollen, she had a chipped tooth in the left side of her mouth, and she complained of a severe headache and dizziness. According to the officer's report, the mother stated the boyfriend had been abusive in the past, but she had not reported it. The boyfriend was arrested and taken to jail.

DHS became involved with the family following the altercation. The children originally remained in the mother's care, but they were removed on June 25, 2015, once it became clear the mother was accepting phone calls from the boyfriend in jail and intended to maintain a relationship with him.[4] All three children were placed with their maternal grandmother and her husband.

The children were adjudicated in need of assistance pursuant to a stipulation in August 2015. The mother was ordered to participate in individual therapy, domestic-violence services, and parenting classes.

In February 2016, I.D. was removed from the custody of the maternal grandparents and placed "in DHS custody for placement commensurate with her needs."

---

[4] The mother was told she was in violation of a no-contact order, and the mother asked to have it dropped. According to the mother's testimony, she remained in a relationship with the boyfriend until November 2015.

Following a permanency hearing in June 2016, the State filed a petition to terminate the mother's rights to all three children. The matter came on for hearing on August 31 and September 1, 2016.

At the hearing, it became clear the mother had taken parenting classes and engaged in domestic-violence services as was required by the court. However, the mother continued to lack appreciation for the harm the children had suffered from witnessing ongoing domestic violence, and she remained protective of the boyfriend.

Hospital records indicated the mother went for medical treatment after being assaulted in September 2014—the boyfriend was living with the mother and her children at the time; at the hearing, the mother testified her injuries were not a result of domestic violence but rather due to being mugged outside of her apartment. When the boyfriend testified later, he was unaware of the mother having ever been mugged or robbed. The mother filed a police report in December 2014 reporting the boyfriend had assaulted her. According to the report, the mother stated the boyfriend had been abusive toward her on other occasions but she had not reported it. At the termination hearing, the mother testified the boyfriend had not assaulted her in December 2014, instead claiming it was a "misunderstanding" and disputing the officer's report regarding her statement about previous incidents of abuse. The mother did not dispute the May 2015 incident—in fact, it was the one perpetration of domestic violence by the boyfriend the mother admitted occurred. From June to August 2015, the mother accepted and received phone calls from the boyfriend while he was jailed. The calls were in violation of a no-contact order and, more importantly, in

disregard of DHS's concerns involving the mother's relationship with the boyfriend and the safety of the children. The boyfriend was released from jail sometime during August 2015, and he and the mother conceived a child sometime in late August or early September. Additionally, the mother was seen dropping the father off at a meeting with his probation officer in September 2015, again in violation of the no-contact order. In December 2015, the mother reported to the police that the boyfriend had assaulted her again. Three days later, she recanted her statement and maintained the boyfriend had not been with her at the time she reported the assault occurred. In May 2016, the mother went to the hospital to give birth. According to the testimony of one of the nurses, the mother arrived at the hospital alone, but she spent some time texting and talking on the phone after she arrived. The nurse heard the mother say into the phone, "Don't worry about other things. Just hurry up and get here." The boyfriend arrived at the hospital sometime later and introduced himself as the mother's husband. The nurse believed the mother was happy to see the boyfriend; they appeared to be affectionate with each other. While the boyfriend was in the room, he had the mother sign the title to the car she had been driving so he could go sell the car. The boyfriend kissed the mother and left. He returned after the child was born and was then arrested for being in violation of the no-contact order.

The mother was adamant the boyfriend had only assaulted her the one time—in May 2015. However, at various times in her testimony, the mother stated the abuse happened "only a couple times." Later, when the mother was asked if there had been more than the May 2015 instance of domestic violence

with the boyfriend, she testified, "Not like that." When the attorney asked for clarification, the mother again returned to the refrain that only one instance of abuse occurred. Another time during her testimony, the mother was asked if she had "characterized to this Court that you only had one instance of domestic violence in your relationship" with the boyfriend, and the mother testified, "No. I said there was one with that severity."

When the boyfriend testified, he admitted he had "put his hands" on the mother "more than one time." He characterized the May 2015 assault as a "more physical" instance of abuse but admitted there had been an "incident" in December 2014—an assault the mother was still testifying had never occurred. The boyfriend later testified that he drank to intoxication every day during the period he lived with the mother. When he was asked if it was "fair to say because of the alcohol consumption . . . that oftentimes it did end up in physical or emotionally abusive displays with [the mother] during [their] relationship," the boyfriend agreed, "Yeah, you could say that." He also admitted that sometimes the children witnessed the abuse. The mother had maintained the children were largely unaware of any fighting or disagreements between her and the boyfriend because the children were in their rooms when it occurred.[5] While the mother

---

[5] The following exchange took place between an attorney and the mother during the termination hearing:

     Q. I mean he struck you; yes? A. Yes. In May, yes.

     Q. Repeatedly? And that's not the only incidence of domestic violence between you and [the boyfriend]? A. We've had arguments, but as far as physical, yes.

     Q. He uses alcohol with frequency? A. He did, yes.

     Q. And that was often the brunt of physical violence between he and you? A. Yes.

was unable to show insight into how the incidents of abuse affected her children, the boyfriend testified that he believed the children were impacted "in a way" by witnessing the violence because "kids learn what they see." Even at the time of the termination hearing, when asked why the children were removed from her care, the mother testified, "[t]hey were removed . . . because of a violation of a no-contact order that I was not aware of."

The mother continued to deny the impact on the children in spite of the testimony by the six-year-old's therapist that I.D. had been diagnosed with posttraumatic stress disorder. Additionally, the therapist testified that I.D. had expressed fear of the boyfriend and was traumatized by having witnessed or knowing of a number of instances of domestic violence.

DHS made it known to the mother that the boyfriend had a founded abuse report from when one of the boyfriend's children presented with head injuries and nonaccidental broken ribs. Additionally, during DHS's involvement with this family, DHS made a founded sexual-abuse assessment involving the boyfriend and the mother's oldest child, who was not a subject of the termination proceedings. The mother argued that DHS had not conducted a proper investigation, and she claimed that her daughter told her the sexual abuse never occurred. She also explained away the boyfriend's issues with his own children.

The maternal grandmother testified the mother had been abused in a previous romantic relationship. She testified that while the mother and I.D.'s

---

Q. And those incidents would bubble out or spill over in front of the children? A. No. Children were in their rooms, so no, they didn't hear anything.
Q. They never saw anything? A. No. Not to my knowledge anyway.

father were living with her in 2010, the mother was pregnant with I.D. and I.D.'s father assaulted the mother. The grandmother testified:

> [H]e about killed her and [I.D.]. . . . And it was a pretty horrific deal. We spent the night in the hospital. We didn't know how [I.D.] was going to be because he had drug [the mother] out of the car, and she was still intertwined in the seat belts, and he was banging her stomach up against the bottom of the door. So we sat there all night with tests to see if the baby was even going to make it.

The father stole the mother's car and went to Las Vegas for a period of time. The grandmother stated she had told the mother she needed to leave I.D.'s father "or he was going to kill her and her baby." Yet when I.D.'s father returned, the mother wanted to be with him. The grandmother testified:

> [W]hen we worked with the sheriff in town, he did a heck of a job . . . . [H]e had policemen coming out of the woodwork . . . [t]hat I had no idea they were even around, waiting for [I.D.'s father] to come back to the house.
> And when he was being arrested, [the mother] was out there crying and telling him she loved him. . . . And at some point later on they ended up getting back together, and she allowed him to move in that apartment . . . .

When asked, the grandmother testified she did not believe the mother was the appropriate place for the children "at the time" because the mother "needs to work on a lot of her own issues to be able to provide a safe and nurturing home." The grandmother noted she had listened to the mother's testimony and felt "like [the mother] is still protecting [the boyfriend] and what he's done to her and these kids." When asked if she thought there was a potential for the children to be reunified with their mother, the grandmother stated:

> If she is willing to go to a therapist and be open and honest with [the therapist] and actually work through these things, possibly. But I have—I have my reservations because she's had over a year to fight for these kids, and as of yesterday I still seen her defending [the boyfriend], so I don't know if—I don't believe that [the mother]

can get herself together to be a good parent for these girls before they're of age.

Although the mother had completed most of the services asked of her, the mother had not discussed with a therapist her experiences of having domestic violence perpetrated against her. After her therapist testified as much at the May 2016 permanency hearing, the mother stopped seeing the therapist[6] and stated she intended to engage another. At the time of the termination hearing approximately three months later, the mother had not yet done so.

In September 2016, the juvenile court terminated the mother's rights to I.D. pursuant to Iowa Code section 232.116(1)(f) (2016) and to K.P. and S.P. pursuant to subsection (h). In doing so, the court stated:

> In sum, these children have suffered significant trauma through their exposure to domestic violence in their mother's home. In spite of over a year of services offered and received, [the mother] is still 1) not acknowledging the extent of the domestic violence she has experienced; 2) not yet dealing with her history of domestic abuse in therapy; and 3) not demonstrating insight into the danger and effect of exposure to domestic violence on her children, given her ongoing involvement with her most recent domestic abuser, consistent with her involvement with her past domestic abuser. Consequently, it is not likely that in the foreseeable future [the mother] will avoid the domestic violence that has plagued her, let alone assist her children in healthfully dealing with the trauma they have experienced.

The mother appeals.

## II. Standard of Review.

We review de novo the juvenile court's decision to terminate a parent's parental rights. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016).

---

[6] The mother may have met with the therapist one time after the permanency hearing; the record is not clear.

**III. Discussion.**

    **A. Chapter 232.**

    The mother maintains the statutory grounds for termination were not proved by clear and convinced evidence; she asserts the children could be returned to her care at the time of the termination. *See* Iowa Code §§ 232.102(5)(a)(2), 232.116(1)(h)(4), (f)(4). We disagree.

    The mother spent much of the proceedings disputing whether a valid no-contact order existed between her and the boyfriend at the time of various documented contacts between the two. In doing so, she focused on whether she had technically broken rules rather than whether it was in her or her children's best interests for her to maintain contact with the boyfriend. She continued to show a lack of insight into why she should not have contact with the boyfriend and the reasons for her children's stated fear of the boyfriend. The mother completed many of the tasks assigned to her, but she was still unable to verbalize why the children were removed and what needed to be done to keep the children safe in the future.[7] The mother claims that because she no longer intended to pursue a relationship with the boyfriend, the State did not satisfy its burden of proof in establishing "[t]he child[ren] cannot be protected from some harm which would justify the adjudication of the child as a child in need of assistance." *See id.* § 232.102(5)(2); *see also In re A.M.S.*, 419 N.W.2d 723, 725 (Iowa 1988) (stating the requirement that there is clear and convincing evidence a child cannot be returned to the custody of the child's parents is met

---

[7] We will not go as far as the juvenile court did and find the mother's participation in services was actually just "playing along" in order to get her children back.

when the child cannot be returned home "because the definitional grounds of a child in need of assistance . . . exist"). We are not convinced the mother is not or will not in the future be in a relationship with the boyfriend. We note the mother was driving the vehicle of the boyfriend's parents and that vehicle sometimes was parked at the parents' house—where the boyfriend also lived—during the period leading up to the termination proceedings. Moreover, even if she does not continue her relationship with the boyfriend, the mother has a history of dating violent men and failing to appreciate the danger of doing so. *See In re M.M.*, 483 N.W.2d 812, 814 (Iowa 1992) ("The threat of probable harm will justify termination [of parental rights], and the perceived harm need not be the one that supported the child[ren]'s initial removal from the home.").

The State established by clear and convincing evidence that the children could not be returned to the mother's care.

Next, the mother maintains the State did not make reasonable efforts to reunite her with the children. Although the requirement that the State expend reasonable efforts toward reunification is not a "strict substantive requirement of termination," reasonable efforts are part of the State's "proof the child cannot be safely returned to the care of a parent." *In re C.B.,* 611 N.W.2d 489, 493 (Iowa 2000). Here, the mother has a laundry list of complaints, arguing each was a failure to make reasonable efforts: DHS only visiting the mother's home once, lack of "family-centered services," and receiving only $400 in gas cards.[8]

---

[8] Additionally, the mother claims that DHS was required to place the children with the least-restrictive placement option as part of reasonable efforts. She then states that she "provided names of relatives for placement." We are unsure what she means by this assertion; all three children were placed with a relative, the maternal grandmother, at the

There is nothing in the record that suggests, and the mother does not provide explanation of her theory, that more money in gas cards or more visits to the mother's home by DHS would have aided in reunification with the children. The mother did not have an issue with missing visits; while she may have wished for additional monetary support from DHS, we cannot see how receiving "only $400" affected her relationship with her children. Additionally, the mother's visits with the children did not move beyond fully supervised, but that was not due to any concerns regarding the state of the mother's home.

The mother claims the lack of family-centered services prevented the children from being returned to her care. We assume she means the lack of family therapy sessions, as she repeatedly raised this issue throughout the proceedings. Before the termination petition was filed, I.D.'s therapist testified the mother and I.D. should not begin therapy together until the mother and the daughter were both ready for an "accountability session." I.D.'s therapist was in communication with the mother's therapist regarding when would be an appropriate time to do so. However, before the mother and I.D. were able to reach that stage, the mother fired her therapist. In the three months leading up to the termination, the mother did not have a therapist for I.D.'s therapist to communicate with. This is not a service DHS refused or failed to provide; rather,

---

time of removal. The six-year-old was later moved to another placement once the grandmother no longer believed she could provide the care the six-year-old needed, but from our review of the record, there was no mention or discussion of other family members able or willing to take the six-year-old at that time. The mother also claims "DHS and the State, with ratification by the district court's orders, conditioned increased and progressing visitation with her children upon her admission that no-contact order existed." We do not believe this claim is supported by the record, and we will not address it.

the mother never progressed to the point where such sessions would be in the best interests of the children.

The mother claims termination of her parental rights was not in the best interests of the children. *See* Iowa Code § 232.116(2). She maintains she is more bonded with the children than they are with their current placements. The record seems to neither support nor contradict the mother's assertion about the relative strength of her bond with the children. That being said, we are confident permanency is in the children's best interests and the mother is not currently able to provide it. *See id.* (requiring the court to "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional needs of the child").[9]

The mother maintains the court was wrong "in failing to find a factor in Iowa Code § 232.116(3) existed." The mother does not specify which of the factors she believes weighs against termination, and upon our de novo review, we do not believe any should be applied here to save the parent-child relationship. *See In re D.W.*, 791 N.W.2d 703, 709 (Iowa 2010) ("[O]ur consideration must center on whether the child[ren] will be disadvantaged by termination, and whether the disadvantage overcomes [the parent's] inability to provide for [the children's] developing needs.").

---

[9] At the termination hearing, the mother requested an additional six months to work toward reunification with the children. However, the mother has not raised a claim of error on appeal regarding the refusal to give the extension, so we do not consider the court's decision to deny the request. *See* Iowa R. App. P. 6.903(2)(g)(1)-(3) (listing what an appellant's brief must include in the "argument section" for each issue raised on appeal).

**B. Ineffective Assistance.**

The mother maintains she received ineffective assistance from her first counsel, who represented her from the start of the proceedings until June 2016. She maintains counsel should have moved the court to bifurcate the roles of guardian ad litem (GAL) and attorney for the children because "there was much contention about the children's wishes and desire, love and bond with their mother versus another placement." *See* Iowa Code § 232.89(4) ("The same person may serve both as the child's counsel and as guardian ad litem. However, the court may appoint a separate guardian ad litem, if the same person cannot properly represent the legal interests of the child as legal counsel and also represent the best interest of the child as guardian ad litem . . . .").

A parent is entitled to effective assistance of counsel, and the test in termination-of-parental-rights cases is generally the same as in criminal proceedings: in order to establish an ineffective assistance claim, it must be shown that (1) counsel's performance is deficient, and (2) actual prejudice resulted. *See In re A.R.S.*, 480 N.W.2d 888, 891 (Iowa 1992). The mother has the burden of proving the attorney was ineffective. *See id.*

The mother's claim fails. The mother's new attorney apparently did file a motion asking that the GAL and attorney for the children be two separate individuals. The first day of the termination hearing opened with the mother's attorney reporting to the court that he had filed a motion and a brief supporting his claim that the mother's intent to call the guardian ad litem "in that role and capacity alone as a witness" meant the two should be separate individuals. In response, the court stated:

I'm trying to read between the lines here. I think the issue perhaps is that there is some belief that one or more of these children have an opinion or have a desire or wish that may be different than what the guardian ad litem is recommending. I believe that the guardian ad litem has a duty to inform the Court if the child's wishes differ from what the guardian ad litem believes is in the child's best interests.

I also believe that the guardian ad litem has a duty to advise the Court and counsel of her compliance of Iowa Code section 232.2(22); in other words, to advise the Court and counsel as to what she has done with regard to the duties that she has under that code section.

She may provide this information by way of a professional statement. She is an officer of the Court in her role as guardian ad litem and in her role as attorney, so I would expect that she would make that professional statement both as to what the child's or children's wishes are if they are different from what she believes is in the children's best interests and that she would state what she has done in advance of her duties in compliance with her duties.

And, [GAL], I would want you to do that prior to the mother putting on any evidence in this particular case so that if she were to want to rebut anything that was contained in the professional statement, then she would have the opportunity to present evidence to do so. So is my ruling clear on that?

The GAL filed her "statement to the court" later the same day, and the issue was never discussed again. The court did not order "bifurcation" of the guardian ad litem and attorney duties for the minor children. Thus, there is no reason to believe that the court would have done otherwise if the mother's earlier counsel had filed the same motion or made the same argument, and counsel had no duty to pursue a meritless issue.[10] *See State v. Brubaker*, 805 N.W.2d 164, 171 (Iowa 2011).

---

[10] Moreover, it is not clear the mother could establish she suffered prejudice even if the role of the children's attorney and GAL should have been split. The weight the court places on the wishes of a six-year-old and two three-year-olds is insubstantial. *See* Iowa Code § 232.116(2)(b)(2) (requiring the court to review, among other things, "[t]he reasonable preference of the child, *if the court determines that the child has sufficient capacity to express a reasonable preference*" (emphasis added)); *c.f. In re A.T.*, 744 N.W.2d 657, 666 (Iowa Ct. App. 2007) (remanding for the juvenile court to appoint a

**C. Motions.**

The mother maintains the court abused its discretion in overruling her "combined motions to strike, to modify placements, and for other relief" and her written objections. We note that the record from these proceedings spans thousands of pages, and although we have carefully reviewed it, we have been unable to find a written or verbal ruling by the court.

Insofar as we can tell, the "written objections" the mother refers to is a written and filed objection to a proposed exhibit, namely the May 2016 report from the family safety, risk, permanency (FSRP) provider. The mother objected "insofar as DHS, the State, or any other party herein, may frame or assert that the FSRP Report serves as 'reasonable best efforts' and further serves to purportedly show that services and assistance were provided and no further requests have been asked or exhausted." Neither we, nor the juvenile court, have relied on the May 2016 report in finding that reasonable efforts had been made to reunite the mother and the children.

In the mother's combined motions, the mother continues to dispute the existence of a valid no-contact order between her and the boyfriend at various times the State maintained one was in place. The mother asks the court to strike any such references, to "admonish the State, DHS, and any other party herein from drawing conclusions or inferences from false assertions of no-contact orders or violations," and to return the children to the mother's care immediately. The purpose of the juvenile court's interference with the family was to keep the

---

separate attorney for the child, who was twelve years old and who "demonstrated a maturity beyond her years").

children safe; whether a valid no-contact order was in place at various points during the court's involvement had no bearing on the children's safety. The court did not abuse its discretion in refusing to provide the relief the mother requested.

For all of the foregoing reasons, we affirm the termination of the mother's parental rights.

**AFFIRMED.**