# IN THE COURT OF APPEALS OF IOWA

No. 24-0490
Filed July 3, 2024

**IN THE INTEREST OF L.H.,**
**Minor Child,**

**M.H., Mother,**
        Appellant.
_____

        Appeal from the Iowa District Court for Dubuque County, Thomas J. Straka,

Judge.


        The mother appeals the termination of her parental rights.  **AFFIRMED.**


        Taryn R. McCarthy of Clemens, Walters, Conlon, Runde & Hiatt, L.L.P.,

Dubuque, for appellant mother.

        Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney

General, for appellee State.

        Kristy Hefel, Dubuque, attorney and guardian ad litem for minor child.


        Considered by Tabor, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

The juvenile court terminated the mother's parental rights to one-year-old L.H. pursuant to Iowa Code section 232.116(1)(h) (2024). The mother appeals, arguing it is in L.H.'s best interests to delay permanency for six months to give the mother more time to work toward reunification rather than granting the termination petition.[1]

Our review is de novo. *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). This means that while we respect the juvenile court's factual findings, especially on credibility issues, "we examine the whole record, find our own facts, and adjudicate rights anew on issues properly before us." *Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 629 (Iowa 1996).

The only issue before us on appeal is whether the juvenile court should have delayed permanency for six months to give the mother more time to work toward reunification. The juvenile court may "give the parent an additional six months for reunification only if the need for removal 'will no longer exist at the end of the additional six-month period.'" *In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021) (quoting Iowa Code § 232.104(2)(b)). It is up to the parent to show "the impediments to placing" the child with them "will not exist in six months." *Id.* And, to give the parent more time, we must also conclude the delay in permanency is in the child's best interests. *Id.* In making our best-interests determination, we rely on section 232.116(2). *See id.*

---

[1] The parental rights of L.H.'s father were also terminated; he does not appeal.

With that in mind, we review the facts of this case. L.H. came to the attention of the Iowa Department of Health and Human Services after she lost 9% of her body weight less than a week after being discharged from the hospital following her January 2023 birth. L.H. was re-admitted for failure to thrive and immediately began to gain weight back once properly fed. The mother, who has both physical and intellectual disabilities, was homeless at the time—she agreed to a safety plan where L.H. was placed in voluntary foster care at the beginning of February 2023.[2] L.H. continued living with that foster family through the time of the termination trial in February 2024.

During the department's involvement with the family, the mother consistently participated in visits, mental-health therapy, and other services and curriculum as required. She maintained appropriate communication with the department and was generally cooperative. As of the termination trial, she was staying with the maternal grandparents and, while not employed, received Social Security Disability Income of approximately $950 each month. Yet, the mother testified she was unsure if the current living arrangement was a long-term option and, if it were, going forward she might be required to pay between $500 and $700 in monthly rent. The mother loved L.H. and shared an obvious bond with her.

Yet it is clear the mother could not take over the full-time care of L.H, who has ongoing, complex medical needs. According to the foster mother, L.H. already had or would soon have medical appointments with cardiology, ENT, ophthalmology, genetics, endocrinology, neurology, and oncology. While some of

---

[2] L.H. was formally removed from the mother's custody in conjunction with the child-in-need-of-assistance adjudication in May 2023.

her medical issues had been resolved, L.H. would need to have regular appointments with many of the doctors for the foreseeable future as well as speech therapy, physical therapy, and occupational therapy. The mother had attended less than half of L.H.'s medical appointments. Both transportation and keeping track of the appointments seemed to be an issue for her. And, even when she was present at appointments, it was not clear the mother was absorbing the necessary information. Additionally, at visits supervised by the maternal grandmother, it continued to be an issue that the mother failed to feed L.H. during the visit. When asked about this at trial, the mother did not deny the failure to give L.H. a bottle but testified that sometimes L.H. was too busy playing to give hunger cues. And at visits supervised by a family support specialist, the mother generally needed to be prompted to feed and change the diaper of L.H. Similarly, the foster mother testified that when she was with L.H. and the mother at doctor appointments for L.H., it was the foster mother who changed L.H.'s diapers and initiated all feedings.

To advocate for an extension, the mother focuses on her own physical and cognitive limitations and argues those limitations, "which are entirely out of her control, left her at a disadvantage in demonstrating the progress that needed to be shown within the applicable statutory time frames." She maintains that with additional time, she can build on and demonstrate the necessary parenting skills. Unfortunately, the record evidence does not support the mother's assertions. The department became involved after L.H. was diagnosed as failing to thrive—an issue that was quickly corrected after the child was properly fed after being re-admitted to the hospital. One year later, the mother still requires prompting to feed the child. Plus, when the case manager was asked at the termination trial whether

the mother showed "any improvement in [her] ability to meet [L.H.'s] needs with regard to feeding, playing, dressing, things like that, from where we started at the outset of the case," the case manager opined: "I personally don't believe so. I think it's kind of getting a bit more difficult as [L.H.] gets older. She is able to flail around and crawl away, for example, when she is getting dressed. I think it's more difficult now than it was in the past." In the same vein, the intervention specialist testified that when L.H. crawls away, the mother is physically unable to follow her. When asked about this during her own testimony, the mother stated she can get up and go after L.H. if the child wanders away but stated that it takes her "a much [longer] time to get up" due to her asthma.

Like the juvenile court, we cannot say that additional time and services will enable the mother to meet L.H.'s needs. "[T]ermination is necessary to serve the child's best interests . . . when the disabled parent lacks the capacity to meet the child's present needs as well as the capacity to adapt to the child's future needs." *In re A.M.S.*, 419 N.W.2d 723, 734 (Iowa 1988). The mother is not able to provide a safe and stable home for L.H. and cannot meet her present or future needs, and additional time will not correct the situation. So, termination of the mother's parental rights is in L.H.'s best interests.

**AFFIRMED.**