# IN THE COURT OF APPEALS OF IOWA

No. 14-1049
Filed December 24, 2014

IN THE INTEREST OF A.H.,
Minor Child,

T.M., Mother,
Appellant.

_____

Appeal from the Iowa District Court for Fayette County, Alan D. Allbee, Associate Juvenile Judge.

A mother appeals the termination of her parental rights to her child. **REVERSED AND REMANDED.**

T. David Katsumes of Katsumes Law Office, Elgin, for appellant mother.

Thomas J. Miller, Attorney General, Janet L. Hoffman, Assistant Attorney General, W. Wayne Saur, County Attorney, and Nathan Lein, Assistant County Attorney, for appellee State.

John Sullivan, Oelwein, attorney and guardian ad litem for minor child.

Considered by Danilson, C.J., and Doyle and Tabor, JJ.

**DOYLE, J.**

A mother appeals the termination of her parental rights to her seventh biological child.  In this exceptional case, we find on our de novo review of the record the State failed to prove the grounds for termination by clear and convincing evidence.  Accordingly, we reverse and remand to the juvenile court for further proceedings including, if necessary, the implementation of reasonable services.

### I.  *Background Facts and Proceedings*.

T.M. is the mother of A.H., the mother's seventh biological child.  The mother has a history of severe substance abuse and involvement with the Iowa Department of Human Services (DHS), including during her own childhood when she was abandoned by her parents.  None of her children are in her custody.  The mother's history paints quite a grim picture, but it also demonstrates the drastic changes she has made in taking control of her life and her addiction.

The mother began using methamphetamine when she was twelve years old.  In 2007, the mother's parental rights to two of her children were terminated due to her continued use of illegal substances and her addiction.  At the time of the 2007 termination-of-parental-rights hearing, the mother was twenty-four years old, had been through recovery or treatment programs three different times, and was participating in a fourth program.

The mother continued abusing methamphetamine over the years. In March 2013, the mother's parental rights to two of her other children were terminated.[1] The juvenile court's ruling detailed the mother's then state of affairs:

> [The mother] terminated her involvement with the [DHS], her participation in services, and her visitation with the children in late September 2012. For more than four months, she had no contact with the children. She ended her participation in [family safety, risk and permanency services (FSRP)], substance abuse treatment, and mental health treatment. She revoked her releases of information that previously allowed the [DHS] to gauge her progress and services. She refused drug testing. She had been diagnosed with adult ADHD . . . but refused any psychotropic medication. Approximately one year ago, she confided to her family therapist that she would continue to use methamphetamine if she could get away with it. She did a complete substance abuse evaluation in September 2012, [and it was found she was] dependent on methamphetamine, marijuana, and alcohol, and [it] recommended [two to four] individual substance-abuse-treatment sessions per month. She did not comply with those recommendations and continued to use illegal drugs. . . .
>
> She had no employment or other source of income. She had lost her housing . . . . She remains on probation for possession of precursors for the manufacture of methamphetamine.
>
> . . . .
>
> The children's mother admits that the potential of losing her children has never been a sufficient motivation for her to stop using drugs, including the very addictive methamphetamine. While recognizing that her current remission is motivated by self-preservation, it is hoped she may be finally successful. Unfortunately, the children in interest cannot wait any longer for their mother to prove her long-term sobriety. She has frequently been able to abstain for several months, only to return to drug use. The children's mother has presented clean urine tests given for her probation officer in January, February, and March 2013. She admits she failed to appear for scheduled drug testing for the DHS . . . in March 2013 on two occasions.

---

[1] Concerning the mother's two eldest biological children, the record indicates the mother's parental rights to one child were terminated and the other child was adopted. The details of the adoption, such as whether the mother voluntarily relinquished her parental rights, is not in the record. The dates for the termination and adoption are also not in the record but appear to be before 2007.

At the time of the 2013 termination-of-parental-rights hearing, the mother was pregnant with A.H., and she gave birth to the child in October 2013. It was reported to the DHS that the mother delivered the child at her home without receiving any medical assistance or having had any prior prenatal care. Based upon its prior involvement with the mother and her children, a safety check was initiated by the DHS. Thereafter, the DHS filed an application requesting the child be removed from the mother's care, explaining that the mother was "unwilling to participate in a [child-in-need-of-assistance (CINA)] assessment at this time." The DHS argued her lack of cooperation prevented the DHS from assessing "whether this child is safe with [the mother], or whether [the mother] has made any changes since [the termination of her parental rights in 2013]." Additionally, the mother would only tell the DHS workers that she "had a doctor appointment scheduled for tomorrow." The child was removed from her care that October and placed with a foster family, where the child has since remained.

At the time of the removal, the child was taken to the hospital for a medical workup. The child's hair-stat test tested positive for methamphetamine, evidencing that although the mother had remained sober for at least the beginning of 2013, she once again lapsed and used methamphetamine. The child presently appears healthy in all respects.

At the end of October 2013, the mother reported to her therapist and the service provider that she drank alcohol to the point of blacking out, and she reported she was unsure if she had used illegal substances or engaged in unprotected sex. Her subsequent drug and pregnancy tests were all negative. Although she was advised she should stay away from alcohol due to her own

addictive behavior and her relatives' known addictions to alcohol, she again drank to the point of intoxication at the end of November 2013, leading to a public intoxication charge. She reported this to her therapist and the service provider.

In November 2013, the juvenile court adjudicated the child a CINA. The court ordered temporary services be offered to the mother, including substance abuse treatment, drug testing, and visitation with the child. The court's ruling noted it would be considering at the dispositional hearing whether aggravated circumstances existed to allow the DHS to waive making reasonable efforts pursuant to Iowa Code section 232.102(12). Thereafter, a case plan was developed by the DHS, referred to as the "refrigerator list." Among other things, this list required the mother to

- attend all scheduled treatment sessions/appointments with her substance abuse and mental health treatment counselors
- comply with all treatment recommendations
- participate in drug testing and provide negative tests
- not associate with known or suspected drug users
- attend all scheduled parent/child interactions and be on time
- participate in all scheduled parent/child interactions
- be responsible for all aspects of the child's care during interactions
- consider the needs of her child when making decisions
- follow any doctor recommendations made for the child
- follow up with area early access services if needed
- manage her money appropriately and keep her bills current and maintain her home

Other than the incidents with alcohol, the mother has followed and abided by the refrigerator list. Nevertheless, the DHS's case worker and the service providers continued to have concerns about the mother's ability to care for the child safely. In the December 2013 social history report, the case worker explained:

[The mother] has a long history of substance abuse. She has mental health issues. [The mother] has had previous terminations of parental rights. [The mother] has not always been consistent in following through with her mental health and substance abuse treatment. [The mother] did not receive [prenatal] care for [the child] during her pregnancy and gave birth to [the child] at home. [The child] tested positive for methamphetamine. . . . [The mother] has had at least two incidents of consuming alcohol since the initiation of this case. . . . [The mother] reported she became intoxicated and subsequently had [her therapist] drug test her because [the mother] wasn't sure whether she had used other substances while intoxicated. [The mother's therapist] reports that drug test was negative for illegal substances. . . .[2] [The mother] gives the impression that if she drinks and then reports it to the appropriate people, she has adequately addressed it.

In the conclusions and recommendations section, the report stated:

[The mother] reports she is changing her life. [The mother] is employed and has established a residence . . . . She did obtain a psychiatric evaluation . . . . [The mother] is participating in substance abuse treatment individually. . . .

[The service provider] is reporting that visits with [the mother] and [the child] go well overall. [The mother] holds the baby and interacts during visits. [The mother] appears to enjoy the time she spends with the baby and gets excited about developmental changes, for example, when [the child] rolled over. [The service provider] has suggested that [the mother] sing to the baby . . . in order to build the bond between them. [The mother] reports she does not know baby songs and that isn't her style of parenting.[3]

---

[2] The report, referring to the mother's November alcohol use and public intoxication arrest, continued on, stating that the mother "had a subsequent incident of drinking *that she did not report.* It came to the [service provider's] attention that [the mother] had been arrested . . . . When asked about it, [the mother] reported she did address these drinking incidents with her substance abuse provider." (Emphasis added.)

While there is no question the mother's past self-reporting has been unreliable, the service provider's notes state the mother actually sent the provider a text message on November 24, 2013, the day after the arrest, that "she had drank over the weekend" because "she was scared about moving and instead of talking about it she drank." The provider's notes further state that when she picked up the mother the next day, the mother "started to tell [the provider] that she had been arrested," and the provider told her she "already [k]new this." Thus, the mother did report the incident.

[3] It is questionable whether a parent's choice of whether or not to sing to her child is something that should be detailed in a social history report, as the report is to contain the information collected during the social investigation—"an investigation conducted for the purpose of collecting information relevant to the court's fashioning of an appropriate

[The service provider] reported a strange incident in which [the mother] made a comment stating something to the effect that the baby was acting differently towards her. [The service provider] reported this comment was disturbing and she explained to [the mother] that baby's [sic] do certain things; i.e. eat, sleep etc. [The service provider] reports there have been at least two incidents in which the baby's diapers were not changed prior to returning her to foster care. One of those incidents resulted in [the child] having a soiled diaper upon her return. [The mother] takes [the child] to her substance abuse treatment appointments. This is occurring due to the logistics and transportation issues surrounding [the mother] going to treatment. Although there are not safety concerns for this occurring, the [DHS] would prefer that the baby not be present, to better ensure that [the mother's] total focus is on treatment.

The recent incidents of alcohol use are concerning for the [DHS], as is [the mother's] apparent lack of understanding about those concerns. [The mother] appears to be angry at the [DHS's] involvement. [The mother] needs to recognize that her choices have brought about DHS involvement. When individuals appear to blame others for their situation and do not hold themselves accountable for their current situation, change is unlikely. [The mother] reports she has made changes in her life. It is accurate she is working and has established her own residency. She is participating in parent/child interactions. [The mother] choosing not to receive prenatal care during her pregnancy and give birth unattended is concerning to the [DHS]. Most troubling is that [the child] tested positive for methamphetamine.

In January 2014, based upon the termination of the mother's parental rights to her other children, the juvenile court found aggravating circumstances under Iowa Code section 232.102(12) (2014) and waived the requirement of making reasonable efforts to reunite the mother with the child. The mother requested the court reconsider its decision, noting she had been doing

---

disposition of a [CINA] case over which the court has jurisdiction." *See* Iowa Code § 232.2(53), (54). Regardless, the account is also inaccurate, as the service provider's November notes indicate at least two instances where the provider noted the mother sang to the child. One note states: "[The mother] interacted with [the child] by talking and singing to her. [The child] responded by cooing and smiling back at [the mother]." Another note states: "[The mother] did interact [well] with [the child]. She fed her and changed her and sang pat-a-cake to her. The service provider modeled peek-boo and other little songs for babies."

everything the DHS had asked of her. However, the court denied her request, finding that,

> given the mother's prior history and recent efforts to conceal her pregnancy from the [DHS], failure to have any prenatal care, and initial resistance to efforts by the [DHS] to protect the child, any recent progress will be short-lived. [The mother] has shown continued signs of addiction to mood altering substances although her drug of choice more recently is alcohol rather than methamphetamine. Sadly, history will repeat itself, if it already has not done so.

The services offered to the mother were then scaled back, including visitation with the child. Nevertheless, she sought voluntary family-centered services and supervised visitation with the child. She voluntarily continued her substance abuse treatment, and when the DHS was unable to pay for her drug testing due to the aggravating circumstances finding, she paid for her own drug testing, and all tested negative for illegal substances. She also voluntarily continued her mental health treatment. The mother requested increased visits with the child, and the court increased her visits to at least twice a week.

A permanency hearing was held in February 2014, and there, the State and the child's guardian ad litem requested the court direct the State to file a petition for termination of the mother's parental rights. The juvenile court subsequently entered its permanency order, so directing. Nevertheless, the court noted in its order that the mother

> has maintained employment and has a residence. She has continued to participate in substance abuse counseling and drug testing is now done at that agency. Recent tests have been clean for illegal drugs. [The mother] signed an application for voluntary services so that she can continue to receive [FSRP]. Visitation has been reduced to once per week and remains fully supervised. . . . Given the lengthy history of drug abuse, the court is unwilling to consider returning the child home at this time.

The State then filed its petition for termination of the mother's parental rights. However, by March, the mother's visits were increased to three visits per week for a total of ten hours.

A hearing on the State's termination petition was held in May 2014. There, the DHS case worker, the service providers, and the child's guardian ad litem opined the mother's parental rights should be terminated. The case worker testified first, stating:

> The number one concern that I have is that [the mother], in spite of the progress that she's made, I believe continues to display a thinking process that doesn't serve her well and ultimately would not serve a child in her care well. My concern is although she has made progress, that I'm not convinced that that progress would continue, and I believe that if the child is returned home, we will find herself back in the situation at some point in the future.

The case worker explained:

> I'll give one example that's troubled me throughout this case. [The mother] has reported that the [methamphetamine] use with this baby in utero that caused [the baby] to test positive was because she used drugs with the father of another one of her children, and she has maintained that she had to use drugs with that individual in order to be able to see that other child.

The case worker further testified that although the mother was making "some technical compliance with some of the objectives," she still had not "internally changed the behavior." The case worker was critical of the mother's initial resistance to having the child vaccinated, testifying the mother had believed it was possible that the vaccinations were risky and could be damaging to infants, but "[w]hat [the mother] seemed to fail to recognize is that she used drugs in utero, and that can also cause damage." However, the case worker

admitted the mother had acquiesced after she received more information about the safety of vaccinations.

The case worker testified she had been concerned with the mother's use of alcohol "since back in November when [the mother] was arrested for public intox," noting she had seen

> a number of individuals who are addicts, meth or other drugs, that use alcohol, and it reduces their inhibitions at times and can sometimes cause them to do other things and use other substances. And in my understanding, your brain does not distinguish one drug from another. So whether it's alcohol, meth, whatever you're using, somebody that's an addict, in my opinion, should not be using substances.

The case worker testified she had gotten a report from a local bartender that the mother had been seen drinking in several bars, including three different times in May, but she conceded the last time she knew for sure that the mother had consumed alcohol was in November 2013.

Another concern the case worker had was that the mother's drug patches for drug testing had fallen off, because the mother told her "early on in the case how she was passing the patch test previously." However, the case worker admitted the mother was referring to her use of the patch prior to this case. Additionally, the worker agreed that the mother was now working a job that required her to sweat excessively, and all of the mother's other tests, including a hair-stat test done in January 2014 when a patch fell off, were clean. The case worker admitted the clean hair-stat test showed the mother had not used in the ninety-day period prior to the test.

As to the mother's mental health, the case worker testified she was not certain if the mother's issues had been resolved, testifying:

> I'm not a doctor. But one of her diagnosis was antisocial personality, and I sometimes wonder if some of what we see and some of the thinking patterns is related to that diagnosis, and that is a diagnosis that's harder to treat. It's not as amenable as, you know, bipolar disorder or something, so, yes, it's very concerning to me.

The case worker admitted the mother took the drug prescribed for her mental health for a while, but the mother called her and told her "she didn't really want to take that medication [because] she was concerned what it might do [to] her." The case worker praised the mother and told her: "What I know about you, you're a strong individual; if you don't think you want it or you need or want to take it, you will contact your mental health person and take care of that." The case worker did not recall that the mother told her the prescribed medication was messing up her sleep patterns and she was afraid she would not be able to get up for work on time, but she testified the mother "may very well have said that." The case worker also testified the mother had been back to her mental health counselor and was now taking a new prescription medication.

Concerning the mother's ability to parent the child safely during visits, the case worker reported there were some items that were "somewhat troubling, but not huge things," such as the mother giving the baby ibuprofen at five o'clock when she was advised to give the baby acetaminophen at six o'clock. However, the case worker admitted the mother had been close to advancing to monitored visits in December 2013, but those visits did not increase for four months due to "the concerns that [the DHS] had about the [drug] patches." The case worker concluded that she did not believe the mother was able to put the child's needs before her own.

A service provider who supervised some of the mother's early visits with the child testified that, "[f]or the most part," the mother's visits went "fairly well." She testified the mother "lacked in making sure . . . a couple of times that she had appropriate things that [the child] was going to need, a bottle, a diaper, or not taking an extra outfit, those types of things. [The mother] wasn't well prepared when we went out into the community." She testified she did not believe the mother had demonstrated the mother was able to put the child's needs ahead of her own, but she admitted she had not had any involvement in the case since January 2014.

Another service provider who supervised most of the mother's visits with the child also testified, stating the mother had "made excellent progress" and was "doing a good job" concerning food and nutrition, keeping her apartment clean and safe, attending doctor appointments, paying all of her bills, and managing her money well. She testified the mother had maintained the same job since June 2013 and had "actually moved up in that job." She testified the mother was providing adequate necessities for the child, including diapers, bottles, and food during the visit. She testified the mother was able to adequately identify and model nurturing behaviors. She even praised the mother's parenting during the period of time the baby had colic, stating that the mother did "an excellent job. She didn't get nervous or frustrated. Sometimes when you have a couple hours of a fussing child, that's stressful, but she has done a good job with that."

Despite these things, this service provider testified she did not believe the child could be returned to the mother's care at that time because she believed "there are considerable risks" and did not "believe that [the mother] has learned

from her mistakes."  Concerning the mother's visits with the child, the provider testified the mother had asked to move from monitored visits to unsupervised visits, but the provider "was not comfortable in moving to unsupervised at that point" because, although she thought the mother had "improved in her care of the child, . . . there were a couple of incidents that were bothersome to [her]."  One incident she described was that "at one point [the mother] left [the child] sitting on the couch and had stepped into the kitchen, and [though] it's not far, . . . it's too far to get there quickly" because the child "was at the age where she could roll off."  Another incident, the child

> just rolled off [the mother's] leg onto the floor, and [the provider] hollered [the mother's name], and she was upset with [the provider for hollering].  And the baby was not hurt.  The baby fell onto carpet, but it scared her, you know.  And an injury could have occurred in a different situation.

> The service provider testified another concern she had was that during

> [p]robably [seventy-five] percent of the visits[, she and the mother] were either going to the bank to get money to pay her rent, to pay an electric bill, to get groceries.  She liked to go out to eat.  [The provider] took [the mother] to and from her sessions with [her substance abuse counselor] during the time visits were supervised.

The provider testified that the mother only had ten hours of visitation a week, and she believed the mother could have taken care of her grocery shopping another time, but she admitted the mother's transportation options were limited.  She testified she told the mother she needed to spend her visits at home, but the mother "put a little guilt trip on [her]," saying "she also had to have a roof over her head and needed groceries and needed to be able to feed her [child]."  She believed the mother's use of visitation time to run errands demonstrated the

mother was putting her needs before the child's needs.  The provider conceded that the mother getting her license back and a vehicle would be a big help.

Additionally, the provider testified the mother told her a trigger for her drug use had been just staying home and that the mother wanted to be busy and out and about.  However, the provider was concerned that if the mother had the child "in her care, that child shouldn't be run all over town.  [The mother] has to figure out different coping skills so she can stay home and have a schedule and a routine for this child and meet this child's routines and not have it out in the community."  Nevertheless, when asked if the mother's being home alone with the child was "a big safety concern" for her, the provider testified she "[didn't] know if [she] could answer that.  It would be a concern.  I mean, I know she—I feel like she is not using at this time.  I guess I can't answer that."  The provider did note that one of the things the mother had done well was that she had developed a support system of clean and sober friends as one of her coping skills.

Another safety concern the provider had was that the mother did not keep her door locked at all times, but she testified there were instances where the mother's door was locked when she arrived.  The provider was also concerned that the mother had found a day care provider for the child but had not yet checked out "the details of this place, how this woman was going to care for her child, watch her interact with other children."  The provider testified in working with the mother, she "felt that there was some decision-making skills that were very concerning.  [She] worked with [the mother] on parenting, nurturing.  [They] talked a lot about schedule.  We talked a lot about budgeting.  [She] supported

her mental health and substance abuse with transportation as well." The provider testified she used the "true thought curriculum" with the mother, which was "quite a large workbook." The provider gave the mother "a couple chapters at a time," testifying "[i]t was a lot of work for her to do as far as filling out the paperwork." She testified she and the mother had only got about halfway through, and that while she thought the curriculum was important to complete, she was concerned because she did not know if the mother "believed she could change her way of thinking." She testified the mother told her, in working with her on the "true thought" process, that

> if the State continues to take away [her] children, [she] will have baby after baby until [she] break[s] the State of Iowa taking them away from [her]. She has also stated she will not do prenatal care. She has also stated she will not deliver in a hospital but at home.

The provider believed her statements raised safety concerns for both the mother and the child.

Contrary to the beliefs of the case worker and service providers, the mother's alcohol and substance abuse counselor testified she believed the child could be returned to the mother's care at that time. She testified she had known the mother for at least eight years, and "she's not the girl [she] met many years ago." She testified the mother was not the same person she wrote "scathing reports about back in [2012]. Those were scathing reports. Honest, they were honest and true, to where [the mother] was at at the time. That is not the girl I have been working with since October." She testified the mother's drug tests had all been negative for illegal substances, and she further shared she actually watched the mother "pee in the cup" so she knew she had not "been pulling

anything out of her pocket." The counselor testified she had no reservations that the child could be returned to the mother at that time "[b]ecause of the changes [she has] seen in her since she has come back this time, since she's been serious. Since she finally got it, got the picture, so to speak." The counselor described the following lifestyle changes she saw in the mother:

> She's had a full-time job for [eleven] months of steady employment. That's her longest employment ever. She's maintained her own apartment for [eleven] months. She completed probation in October 2013. She's no longer on probation. She quit smoking cigarettes in January of 2013. That's [sixteen] months of no nicotine. If she can quit nicotine, she can also quit the others.
> She's eating healthier. She does treadmill exercising, walking, she's joined a softball league. She takes the steps out here when we come to court instead of the elevator. She's not associating with her former using crowd.
> She's not pregnant. Big one. She's not in a relationship. She is self-sufficient for the first time in her life. She's remained involved in treatment for the past seven months, probably also the longest treatment episode that she's had. She's had 21 of 27 appointments. That's really good attendance. She's had the 22 clean UAs, 25 including the two from her probation officer and the hospital prior to when I saw her for the assessment.
> . . . .
> . . . She's had three alcohol uses . . . . That was six months ago, okay? That's six months.
> . . . .
> [And nothing we know of for the last six months for alcohol use or] drug use . . . . And there is a difference between lapse and relapse. Lapses are an expected part of recovery. In recovery, those lapses are learning experiences, reinforcing the realization and internalization that the person cannot safely use any mood altering substances, which I believe [the mother] has learned, especially since her last two drinking episodes. And, again, today's and current, [the mother] is not the [girl] I described in . . . April and August of 2012. There has been a substantial shift in her recognition of how her addiction has negatively impacted her life and the life of her children in the past and is truly desiring of maintaining the changes she has made in this last year.

The counselor was also critical of the DHS, stating:

I'd also like to make a comment on—about how [the mother] shared with DHS how she used to beat the patches. . . .  I believe [the mother] did that not as a boasting thing but as a way to make the DHS workers and the UA people aware of some of the tricks of how addicts try to beat the system, but yet that is turned around back on [the mother], that, well, you must still be doing that, too. That was not her intention.

Her counselor summarized:

Another response to one of the comment, statements of, well, the best predictor of future behavior is past behavior.  I've heard that thrown around in court a lot.  And there is an element of truth to that.  But the rest of that belief in that evidence is being ignored.  The . . . whole saying is, the best predictor of future behavior is past behavior unless there is significant lifestyle change.

In my opinion, [the mother] has made [a] significant lifestyle change and has maintained that change for the last year.  Have there been lapses?  Yup, sure has.  There has been two meth uses, . . . November 2012 and July 2013, eight months apart. That's pretty good for a meth user; very good, I would say.

The mother testified on her own behalf.  She testified that before giving birth, she was in contact with an online support group for at-home birthing, and she also contacted a medical supply company and purchased "umbilical cord clamps, the umbilical cord cutter, sanitary, like plastic to put down—just all the equipment and supplies."  She testified she researched it for a couple of months and was prepared, though she admitted she was scared.  She testified she told a good friend of hers who lived nearby when her contractions started, and she planned to call 911 if there were any problems, but she had none.

The mother admitted she consumed alcohol in October and November 2013, but she denied any other alcohol use.  She admitted she had been to bars for a coworker's going away party and for a birthday party.  She testified she had one virgin Bloody Mary, socialized with the people she worked with for a while,

and then left. She testified she paid for her own drug testing after the DHS stopped offering it.

She addressed in her testimony the numerous concerns raised by the case worker and service providers regarding her parenting. She testified based upon her work and counseling sessions, her opportunity to run errands fell within the same time as her opportunity to have her daughter, but she admitted her "time management could be better used as far as separating those." However, she testified that she had paid off all of the money she owed to the State, and she was now eligible to get her driver's license back. She further testified she planned to get a vehicle in the next week.

She admitted she had been opposed to vaccinations in the beginning, but after talking to the service provider about it, she agreed. Concerning the potential-baby-falling-off-the-couch incident, she testified there was a footstool sitting next to the couch, and due to the size of her apartment, the kitchen was maybe "five long footsteps" away. Concerning the other baby-rolling-down-her-leg incident, she testified the baby slipped off her knee, and she caught her as she was about to hit the floor. Regarding her choice of daycare provider, the mother testified she contacted this daycare because it was the only one available to take the child before 6 a.m. when she had to be at work. She further testified several of her coworkers had recommended the daycare, and it was also convenient because it was across the street from her apartment. Nevertheless, she testified she would check it out further before she took her child there.

The mother admitted she had made inappropriate comments to the service provider regarding having more children, but she testified it was out of frustration, explaining she had tried to stay positive, saying

> I'm doing well. [The child] is coming home. I haven't done anything wrong. I'm doing what I need to do. I'm a good mom. I try to stay that way all the time for everyone. When you build up a reputation, like I have, for ten years, it's hard to do, and it's even harder if you have someone constantly in your face saying what if, what if, what if. I lived off what if for ten years, and it got me sick as hell. Sorry. So, yes, I have gotten frustrated. I have said things I do not mean.

She testified she was done having children. She testified she wanted the child "to come home. I want her to be with her mom. I want to be able to be a mother to her," and she asked the court, "if extending this or keeping DHS or returning her home or whatever option there is, to give her the chance to have her mom, to give me the chance to be a mom." She stated her actions spoke louder than words, and her "lifestyle and her life should say it all."

The State called a bartender as a rebuttal witness, and the bartender testified that in maybe December or January, the mother was in the bar where the bartender worked, and the mother was intoxicated to the point of passing out in the booth. However, the bartender testified this incident could have been the November 2013 drinking incident wherein the mother got arrested for public intoxication. The bartender also testified she had seen the mother in another bar where her friend works four or five times since the start of 2014. She testified she "witnessed the mother drinking Bud Light out of a bottle" two weeks prior to the hearing while sitting at a table with other people. She also testified she saw the mother drinking Bloody Marys but could not say if her drinks contained alcohol.

At the close of the hearing, the child's guardian ad litem made a statement to the court recommending the mother's parental rights be terminated. He explained:

> I'm glad [the mother] is trying to change her life, so she says. This isn't about second chances. This is about really whether or not . . . a seven-month-old infant is going to be safe in [the mother's] care.
>
> We've got—there is a reason that the legislature has one of its terms or one of the . . . statutory grounds for termination are evidence of prior terminations of parental rights. Here we have had prior terminations for I think [five children]. We have had five prior terminations of parental rights.
>
> And unfortunately, this is just—I believe it's the fourth verse of the same song. And it always starts out with a similar feel, where we have an incident that happens, and she kind of has some technical compliance, but from what we hear from the service providers, is that there hasn't been an internal—the thinking process and the internal heart has not changed. We're going through the motions of wanting to seek our children, but we're not— I just don't see that [the mother] has been placing the needs of her children first.
>
> There is patterns in all of these cases for the court, you know, the court's recollection, the court remembers, initially when [one of the mother's children] had been removed, [the mother] shaved not only his head but his eyebrows so they couldn't perform tests, and for anyone that has had little children, just, you know, you think about the resistance they put up when you try and just wash their face off, you know, after eating a cookie, and you have to think about the—the action, what you have to do to kind of—as I was thinking about that, to do that. You know, you see the pattern in that. I'm sorry.
>
> Having the baby at home, I think the evidence in the record would support that [the mother] was trying to evade detection by the [DHS]. Again, she is not only placing the baby at risk, she is placing herself at risk. The baby could have died. Something could have happened to her. This is—she didn't have any prenatal care. This is not 1840s Iowa, we're on the frontier, and there is a problem. There is a hospital four blocks up the street. And we didn't take advantage of that because evidently she knew that there was going to be some type of—lots of drug tests.
>
> And here we—you know, [the case worker] testified that she is what—you know, her concerns are that the thought process of [the mother] of not—have not completely come back, and I think all

the evidence points to that. She still has trouble placing the needs of her child above her own.

We've heard some testimony that perhaps she has been drinking as early as two weeks ago. You know, someone that's maybe in remission or trying to recover from an addiction, you know, she shouldn't be stepping in a place, a saloon or bar at all, they should be away from that.

While it's not illegal to drink, there are certain triggers in effect. There might be certain people there that can tempt you. And, you know, we see in the record talking about her, and she talked about her concerns about blacking out. She still is drinking, and you think about that, you have a single mom at home with a seven-month-old infant, she decides or comes to some other type of lapse or relapse, she blacks out, and the child is at home, you know. She is the only one there. What's going to happen?

So I think normally, you know, the law is—we look at conduct that someone did, you know, maybe especially in a criminal context, we don't charge somebody with something they didn't do, but the termination provisions in the Code provide—they are there because past performance is indicative of future results in the cases, and it's sad but true. And I think that at this point, Your Honor, I think that I would have to recommend that—well, that parental rights be terminated.

Following the hearing, the juvenile court entered its ruling terminating the mother's parental rights pursuant to Iowa Code section 232.116(2)(g), (h), and (*l*). The court's ruling noted she "complied with many of her requirements under the case plan." Specifically, the mother

attended all but one interaction or visitation with the child. Prior to January 2014, visitation occurred four times per week for two hours each. After the aggravating circumstances finding, the [DHS] reduced visitation to one two-hour visit each week. Upon application to the court, the visits were increased to three visits per week, totaling ten hours. Visitation moved from supervised to monitored as of April 24, 2014. . . . [The mother] was credited with soothing the child and not becoming frustrated during the period when the child was colicky. . . . [The mother] participated in a substance abuse evaluation . . . and was diagnosed with methamphetamine, alcohol, and marijuana dependence, all in remission. She participated in weekly individual sessions thereafter and attended twenty-one of twenty-seven scheduled appointments. During those scheduled appointments, the agency has provided monitored urine testing and reports all tests were clean, although

notably not random, but frequent. Prior to the aggravating circumstances finding, the [DHS] was also providing drug testing. Sweat patches became problematic, . . . as the mother's employment required her to sweat a great deal, causing the adhesive on the patch to come loose. The mother admits that she knew how to beat the patch in any event by removing it, freezing it, and replying it prior to its testing. A hair-stat test was completed on January 24, 2014, . . . and it was clean indicating no methamphetamine or marijuana use for the past ninety days. While the child's mother appears to have been clean for methamphetamine since prior to the child's birth the 2013, she has continued to use alcohol. She was arrested on November 24, 2013, for public intoxication. . . . She was seen in a bar . . . and in the proximity of alcoholic beverages on May 2 and May 16, 2014. She admits alcohol has caused her problems in the past, but continues to use them to the point of intoxication and "blackout." A vulnerable infant requires a full-time parent and not one who "parties" without regard even for her own well-being. . . . It was recommended she began [taking a prescription drug] for her ADHD, however she declined. It is reported, however, that she recently is taking a [different prescription drug]. She was to follow-up with the agency concerning possible depression in November; however, [it] does not appear she followed that recommendation. To her credit, the mother has maintained her employment . . . for the past eleven months. She has maintained an appropriate apartment just a few blocks from work. . . . She has managed her money and paid off her fines so that she can get her license back.

Nevertheless, the court found the mother appeared to be "unable or unwilling to change her pattern of behavior." The court found the mother had "parented appropriately with one notable exception of the leaving of the child attended on a couch from which the child could have rolled." The court also noted statements the mother had made, including one prior to the child's birth that she had provided the father of one her children drugs and sex in return for visitation with that child. Additionally, the court quoted the mother's statement that "she would merely continue to have more children and eventually 'break' the state financially," finding it did "not show proper response or understanding of why her

children are being permanently removed from her custody." The court found the mother continued

> to put her needs above those of her child. While she is evidently substituted alcohol for methamphetamine, she knows that alcohol has only led to problems in her life. Her current lifestyle of drinking to the point of intoxication and not knowing if she is having unprotected sex or using illegal drugs is not conducive to raising a baby. Without the ability to take the steps necessary for complete sobriety, the child's mother cannot be trusted with [the child's] care.

The court concluded the child could not be returned to the mother's home at that time without the imminent risk of harm to the child "due to the lack of proper supervision and lack of proper care as a result of the mother's substance abuse."

The mother now appeals. She contends the juvenile court erred in finding aggravating circumstances to waive the providing of reasonable services. Additionally, she asserts the State failed to prove the grounds for termination by clear and convincing evidence, as found by the juvenile court.

## II. Standards of Review.

Our standard of review for appeals from the termination of a parent's parental rights is de novo. *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014). "To support the termination of parental rights, the State must establish the grounds for termination under Iowa Code section 232.116 by clear and convincing evidence," which "means there are no serious or substantial doubts as to the correctness or conclusions of law drawn from the evidence." *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000). Consequently, we will affirm the juvenile court's termination-of-parental-rights ruling if clear and convincing evidence supports the termination. *See In re P.L.*, 778 N.W.2d 33, 41 (Iowa 2010); *In re D.S.*, 806 N.W.2d 458, 465 (Iowa Ct. App. 2011). In exercising de novo review, we are not

bound by the juvenile court's factual findings, but we do give them weight, especially when it comes to witness credibility. *See A.M.*, 843 N.W.2d at 110.

### III. Discussion.

The parent-child relationship is constitutionally protected. *See Quilloin v. Walcott*, 434 U.S. 246, 255, (1978); *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972); *State v. Iowa Dist. Ct.*, 828 N.W.2d 607, 615 (Iowa 2013); *In re K.L.C.*, 372 N.W.2d 223, 226 (Iowa 1985). Notwithstanding:

> The protection of children is one of the most well-established duties and public policies of the State of Iowa. The State has a duty to assure that every child within its borders receives proper care and treatment, and must intercede when parents fail to provide it. Both [the] DHS and the juvenile court have the important function of protecting children who are in need of assistance.

*In re A.M.*, ___ N.W.2d ___, ___, 2014 WL 6497172, at *8 (Iowa 2014) (alterations, internal citations, and quotation marks omitted).

In light of these competing interests, the legislature has directed chapter 232 be "liberally construed to the end that each child under the jurisdiction of the court . . . receive, *preferably in the child's own home*, the care, guidance and control that *will best serve the child's welfare* and the best interest of the state." Iowa Code § 232.1 (emphasis added); *see also A.M.*, ___ N.W.2d at ___, 2014 WL 6497172, at *5. Thus, "[w]e afford a rebuttable presumption that the best interest of a child is served when custody is with the natural parents," *In re N.M.*, 491 N.W.2d 153, 156 (Iowa 1992), and "[w]henever possible the court should permit the child to remain at home." Iowa Code § 232.102(5)(a). Consequently, while "[i]t is the duty of the juvenile court *when necessary to intervene* and

remove a child from the care and custody of parents, either temporarily or permanently," the court must first determine

> that "continuation of the child in the child's home would be contrary to the welfare of the child, and [it] shall identify the reasonable efforts that have been made." [Iowa Code] § 232.102(5)(b); *see also* [Iowa Code] § 232.102(10)(a) (defining "reasonable efforts"). These determinations, required by law, are essential to the juvenile court's role as the arbiter of both temporary and permanent custody for children in need of assistance.

*A.M.*, ___ N.W.2d at ___, 2014 WL 6497172, at *8-9 (emphasis added).

### A. *Waiving Reasonable Efforts*.

The goal of a child-in-need-of-assistance proceeding is to improve parenting skills and maintain the parent-child relationship, *see In re H.L.B.R.*, 567 N.W.2d 675, 677 (Iowa Ct. App. 1997), and the State is required to make reasonable efforts to have children returned home. *See* Iowa Code § 232.102(5), (10). However, the State's reasonable-efforts obligation can be waived in limited specified circumstances set forth in Iowa Code section 232.102(12), including:

> If the court determines by clear and convincing evidence that aggravated circumstances exist, with written findings of fact based upon evidence in the record, the court may waive the requirement for making reasonable efforts. The existence of aggravated circumstances is indicated by any of the following:
> . . . .
> c. The parent's parental rights have been terminated under section 232.116 with respect to another child who is a member of the same family, *and there is clear and convincing evidence to show that the offer or receipt of services would not be likely within a reasonable period of time to correct the conditions which led to the child's removal*.

*Id.* § 232.102(12)(c) (emphasis added).

The juvenile court adjudicated the child a CINA under Iowa Code section 232.2(6) paragraph (o), which states a CINA includes a child whose body tested positive for an illegal drug "as a direct and foreseeable consequence of the acts or omissions of the child's parent." Additionally, the child was adjudicated CINA under 232.2(6) paragraph (c) subparagraph (2), which states a CINA includes a child that "has suffered or is imminently likely to suffer harmful effects as a result of . . . [t]he failure of the child's parent . . . to exercise a reasonable degree of care in supervising the child."

The Iowa Supreme Court recently discussed the definition of "harmful effects" as referred to in paragraph (c). *See In re J.S.*, 846 N.W.2d 36, 41-42 (Iowa 2014). There, the court explained:

> Although chapter 232 does not contain a definition of "harmful effects," we have noted it "pertains to the physical, mental or social welfare of a child." Because of this broad definition, we have found such effects established when there was harm to a child's physical, mental, or social well-being or such harm was imminently likely to occur. Hence, a juvenile court could reasonably determine that a parent's *active addiction to methamphetamine* is "imminently likely" to result in harmful effects to the physical, mental, or social wellbeing of the children in the parent's care.
> . . . .
> Having said all that, we do not believe general statements about methamphetamine addiction are enough by themselves to prove that a child is imminently likely to suffer physical harm under section 232.2(6)(b). In this case, from what we can tell on this record, a grandparent was willing and able to step in and relieve [the parent] of parenting duties when she was not up to the task. As a result, the children were well-groomed, well-dressed, well-fed, and generally well-cared for while at their grandmother's. To some extent, what happened here is analogous to what occurs when a parent falls ill or becomes disabled and leaves her or his children with a relative. We would rather have parents who are grappling with untreated addiction rely on the services of a relative than do nothing, and so it seems unfair not to take that into consideration at all.

*Id.* (emphasis added) (internal citations omitted).

By the time of the disposition hearing in January 2014, the mother had abstained from methamphetamine use since at least the time of the child's birth in October 2013, approximately four months. Four months abstinence is not much. Although there were reports the mother had used alcohol, there was no evidence the mother had drank to the point of intoxication beyond her own self-reported incidents in October and November 2013. The child was not in her care in either instance. There were no reports she had alcohol on her breath or was intoxicated during any visits. All of the mother's drug tests were negative for illegal substances.

In the month of December 2013, the mother had seventeen visits with the child. The service provider noted on multiple occasions the mother fed and changed the child, meeting the child's needs, though the provider also noted a couple of times she had to remind the mother to check or change the baby's diaper. The service provider noted on one occasion she "didn't observe any concerns" but noted the child had slept "most of the interaction." The mother bought toys for the child and kept her home clean while maintaining a job. The provider praised the mother for planning ahead when she "worked [eight days] straight trying to prepare for low holiday pay checks." There were no reports of concerns of the child's safety while visiting with the mother.

Despite the mother's unfortunate history, we disagree with the juvenile court that there was clear and convincing evidence at the time of disposition to show that the offer or receipt of services would not be likely within a reasonable period of time to correct the conditions which led to the child's removal. Upon

our de novo review, the mother's four-month sobriety at that time, coupled with her job, her home, and lack of safety concerns during her visits with the child clearly show the mother was on track for reunification with her child. This mother's past is damning, but looking at her progress in this particular instance, aggravating circumstances did not exist to waive the State's requirement to provide reasonable efforts.

Nevertheless, there is a serious error preservation concern here.[4] The aggravating circumstances finding was in the dispositional order, which is a "'final,' appealable order." *In re Long*, 313 N.W.2d 473, 476 (Iowa 1981). We have held that a parent must appeal the dispositional order to challenge deficiencies from any of the CINA proceedings to preserve the alleged errors for our review. *See In re J.D.B.*, 584 N.W.2d 577, 581 (Iowa Ct. App. 1998) (stating where a mother did not appeal from any of the CINA proceedings, the time for appeal had passed and she could not challenge deficiencies in the CINA proceedings in the current appeal regarding the termination of her parental rights); *In re D.S.*, 563 N.W.2d 12, 15 (Iowa Ct. App. 1997) (finding the principles of res judicata barred a father's claim of error where order was not appealed). Though the mother initially appealed from the order and the court's ruling denying her motion to consider, she dismissed her appeal. Consequently, it appears error on this issue was not preserved for our review. However, we need not rest our reversal on this ground, because we also conclude the grounds for

---

[4] The State did "not take a position regarding whether or not this issue was properly preserved by [the mother] as it did not have access to the termination of parental rights transcript herein."

termination of her parental rights were not proven by the State by clear and convincing evidence.[5] We therefore turn to that issue.

### B. Grounds for Termination.

The Iowa Supreme Court has explained that our

> statutory scheme recognizes the conflict between a parent's interest in continuing to raise their child as part of their family and the State's interest in providing a stable, loving homelife for the child as soon as possible. A parent's right to raise his or her child is an important interest warranting deference and, *absent a powerful countervailing interest*, requires protection. Our court has recognized a parent's right to raise his or her child in an early case applying chapter 232's termination provisions.

*P.L.*, 778 N.W.2d at 38 (emphasis added) (internal citations omitted). The court in *P.L.* pointed out that this framework was adopted to promote the child's best interest, which occurred when the framework was "properly applied as written." *Id.* at 39. Consequently, the court reaffirmed that, in determining whether parental rights should be terminated under chapter 232, the juvenile court must follow a three-step analysis. *See id.*; *see also In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010) (citing *P.L.*). The very first step requires the court to determine if a

---

[5] After our opinion in *J.D.B.* was filed, the legislature amended chapter 232, which included "some transformation" of the reasonable efforts requirement. *See C.B.*, 611 N.W.2d at 493; *see also J.D.B.*, 584 N.W.2d at 581; 1998 Iowa Acts ch. 1190, §§ 10-17. Among the changes was the addition of Iowa Code subsection 232.102(12), at issue here, allowing the court to waive the reasonable-efforts requirement if it determines aggravating circumstances exist. *See* 1998 Iowa Acts ch. 1190, § 17 (renumbered from subsection (11) to (12) by the Code Editor). We note the legislature also added at that time subsection 232.99(2A), which requires the juvenile court to "inquire of the parties as to the sufficiency of the services being provided and whether additional services are needed to facilitate the safe return of the child to the child's home" at the initial dispositional hearing, as well as at any dispositional review, permanency hearing, or any hearing held under section 232.103. 1998 Iowa Acts ch. 1190, § 10. We have not been asked, nor do we need to decide, if the addition of subsection 232.99(2A) alters the need to appeal the dispositional order to preserve error if a parent continues to challenge the sufficiency of services provided at each hearing following disposition, as our basis for reversal rests on other grounds.

ground for termination under Iowa Code section 232.116(1) has been established by the State. *See P.L.*, 778 N.W.2d at 39; *see also D.W.*, 791 N.W.2d at 706. *If* grounds are established, the court *then* moves to the second step: "apply[ing] the best-interest framework set out in section 232.116(2) to decide if the grounds for termination should result in a termination of parental rights." *D.W.*, 791 N.W.2d at 706; *see also P.L.*, 778 N.W.2d at 39. This secondary determination is informed by giving "primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." *P.L.*, 778 N.W.2d at 39 (citing Iowa Code § 232.116(2)). So, while all of these considerations are important, we only look at these considerations if the State has first proven statutory grounds for termination. *See generally id.*

### 1. *Iowa Code Section 232.116(1)(g).*

Termination a parent's parental rights under paragraph (g) requires the court to find the State proved all of the following:

> (1) The child has been adjudicated a [CINA] pursuant to section 232.96.
> (2) The court has terminated parental rights pursuant to section 232.117 with respect to another child who is a member of the same family . . . .
> (3) There is clear and convincing evidence that the parent continues to lack the ability or willingness to respond to services which would correct the situation.
> (4) There is clear and convincing evidence that an additional period of rehabilitation would not correct the situation.

Iowa Code § 232.116(1)(g).

There is no question the first two elements were established here. As to the third and fourth elements, if we only look at the mother's past, which

admittedly is rocky, it is easy to conclude she lacked "the ability or willingness to respond to services which would correct the situation" or that she could not be rehabilitated. However, the language of element three is present tense; it required the State to prove, by clear and convincing evidence, that she "continues to lack the ability or willingness." *See Id.* The mother does not dispute that she lacked the ability or willingness in her past; she asks the court look at her present actions. And, the overwhelming evidence here shows that the mother was not only willing to respond to services, she was able to respond to services to correct the situation. She did so voluntarily after the court found aggravating circumstances and services were limited. This mother even paid for her own drug testing and demonstrated she continued to be drug-free. She had held a full-time job for many months, had maintained a stable and safe residence, had regular visitation with her child, and had maintained mental health and substance abuse treatment. On our de novo review of this record, the State failed to prove by clear and convincing evidence element three of the statutory ground stated in paragraph (g). For the same reasons, we find the State failed to establish by clear and convincing evidence that an additional period of rehabilitation would not correct the situation, element four of paragraph (g). Consequently, the State failed to establish the ground for termination under Iowa Code section 232.116(1)(g).

### 2. Iowa Code Section 232.116(1)(h) and (l).

We combine our review of the grounds found under Iowa Code section 232.116(1)(h) and (*l*) because both contain a similar element. Under paragraph

(h), the State is required to prove by clear and convincing evidence, all of the following:

> (1) The child is three years of age or younger.
> (2) The child has been adjudicated a [CINA] pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) *There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents* as provided in section 232.102 *at the present time.*

Iowa Code § 232.116(1)(h) (emphasis added). Paragraph (*l*) requires the State to prove by clear and convincing evidence, all of the following:

> (1) The child has been adjudicated a child in need of assistance pursuant to section 232.96 and custody has been transferred from the child's parents for placement pursuant to section 232.102.
> (2) The parent has a severe substance-related disorder and presents a danger to self or others as evidenced by prior acts.
> (3) There is *clear and convincing evidence that the parent's prognosis indicates that the child will not be able to be returned to the custody of the parent within a reasonable period of time considering the child's age and need for a permanent home*.

*Id.* § 232.116(1)(*l*) (emphasis added). We focus on element four of paragraph (h) and element three of paragraph (*l*), because we find, on our de novo review of the record, the State failed to prove, by clear and convincing evidence, the child could not have been returned to the mother's custody at the time of the termination hearing.[6]

---

[6] It necessarily follows that if we find the child could be returned to the mother's care at the time of the termination hearing, element four of paragraph (h), there was evidence the child could be to be returned to the custody of the parent within a reasonable period of time, element three of paragraph (*l*). We therefore combined our review of these grounds. We note, however, paragraph (*l*) has been amended, as reflected above in element two, to require court to find parent has "a severe substance-related disorder," not merely "a severe, chronic substance abuse problem" as was

Iowa Code section 232.102, referenced in element four of paragraph (h), states in subsection (5):

> a. Whenever possible the court should permit the child to remain at home with the child's parent. . . . Custody of the child should not be transferred unless the court finds there is clear and convincing evidence that:
> (1) The child cannot be protected from physical abuse without transfer of custody; or
> (2) The child cannot be protected *from some harm which would justify the adjudication of the child as a [CINA]* and an adequate placement is available.
> b. In order to transfer custody of the child under this subsection, the court must make a determination that continuation of the child in the child's home would be *contrary to the welfare of the child, and shall identify the reasonable efforts that have been made. The court's determination regarding continuation of the child in the child's home, and regarding reasonable efforts*, including those made to prevent removal and those made to finalize any permanency plan in effect, *as well as any determination by the court that reasonable efforts are not required, must be made on a case-by-case basis.* The grounds for each determination must be explicitly documented and stated in the court order. However, preserving the safety of the child is the paramount consideration. *If imminent danger to the child's life or health exists at the time of the court's consideration*, the determinations otherwise required under this paragraph shall not be a prerequisite for an order for removal of the child. If the court transfers custody of the child, unless the court waives the requirement for making reasonable efforts or otherwise makes a determination that reasonable efforts are not required, reasonable efforts *shall be made to make it possible for the child to safely return to the family's home*.

*Id.* § 232.102(5) (emphasis added).

---

previously required in paragraph (*l*). *Compare* Iowa Code § 232.116(1)(*l*)(2) (2011) with Iowa Code § 232.116(1)(*l*)(2) (2013). Consequently, we need not address whether a diagnosis of a disorder would require expert testimony, though we note that in other contexts, such as medical malpractice, our courts have required the introduction of expert testimony when the issue involves "highly technical questions of diagnoses" that "lie beyond the understanding of a layperson." *See Donovan v. State*, 445 N.W.2d 763, 766 (Iowa 1989); *see also In re G.B.*, No. 14-1516, 2014 WL 6682456, at *4 (Iowa Ct. App. Nov. 26, 2014) (reversing termination of parental rights based upon juvenile court's use of old definition in section 232.116(1)(*l*)(2)); *In re L.S.*, No. 14-1080, 2014 WL 5252948, at *6-7 (Iowa Ct. App. Oct. 15, 2014) (same).

There is no clear and convincing evidence the child was in danger from physical abuse at the time of the termination-of-parental-rights hearing as needed in section 232.102(5)(a)(1). Section 232.102(5)(a)(2) requires there be "some harm which would justify the adjudication of the child as a [CINA]." We must therefore determine if any of the definitional grounds of a CINA exist as defined in section 232.2(6) subsections (a) through (q). *See In re A.M.S.*, 419 N.W.2d 723, 725 (Iowa 1988). Proof by clear and convincing evidence of any one of the types of harm set out in the subsections is sufficient to support termination. *See id.* We find none of them apply here, and we briefly address the definitional grounds that could arguably apply in this case.

First, there is no clear and convincing evidence the mother has abandoned or deserted the child. Iowa Code § 232.2(6)(a). There is no clear and convincing evidence the child, if returned to the mother's care, is "imminently likely" to be abused or neglected. *See id.* § 232.2(6)(b). There was no clear and convincing evidence the mother failed "to exercise a minimal degree of care in supplying the child with adequate food, clothing, or shelter" or that she refused "other means made available to provide such essentials." *See id.* § 232.2(6)(g). There was no clear and convincing evidence the mother's mental condition had resulted "in the child not receiving adequate care." *See id.* § 232.2(6)(n). Given the mother's demonstrated continued sobriety, there was no clear and convincing evidence shown at the time of the termination hearing that the child would be exposed to illegal drugs and test positive for drugs. *See id.* § 232.2(6)(o).

There is no clear and convincing evidence the child, if returned to the mother's care, is "imminently likely" to suffer any harmful effects as a result of a

mental injury by the mother or the mother's failure to exercise a *reasonable* degree of care in supervising the child. *See id.* § 232.2(6)(c)(1), (2). Leaving the child unattended on the couch one time is not evidence she will fail to exercise a reasonable decree of care in supervising the child. Additionally, as the supreme court recently stated, general statements about methamphetamine addiction are not "enough by themselves to prove that a child is imminently likely to suffer physical harm under section 232.2(6)(b)." *J.S.*, 846 N.W.2d at 41-42. This also applies to the mother's consumption of alcohol and her alleged addiction. *See generally id.* The evidence at the time of trial was that the mother had not used methamphetamine since at least October 2013, and she had a Bud Light in May 2014. This is simply not enough to establish the child was "imminently likely" to suffer any harm.

There was no clear and convincing evidence the child was in need of medical, mental health, or substance abuse treatment and the mother was "unwilling or unable to provide such treatment." *See id.* § 232.2(6)(e), (f), (m). Giving the child acetaminophen an hour early, while not recommended, does not rise to the level of statutory harm. Additionally, questioning the safety of giving your child vaccinations does not rise to the level of statutory harm, though the mother ultimately agreed to the vaccinations anyway.

There was simply no clear and convincing evidence, at the time of the termination-of-parental-rights hearing that *this* child was in "some harm" under any of the possible adjudicatory harms defined in section 232.2(6). *See id.* § 232.102(5)(a)(2). Consequently, the State failed to prove by clear and convincing evidence that the child could not "be returned to the custody of the

child's parents as provided in section 232.102 at the present time." *See id.* § 232.116(1)(h)(4). For the same reason, the State failed to prove by clear and convincing evidence that there was evidence the child could not be returned to the mother's custody within a reasonable period of time. *See id.* § 232.116(1)(*l*)(3). Because these elements were not established, the State failed to establish grounds for the termination of the mother's parental rights under paragraphs (h) and (*l*).

### *IV. Conclusion.*

This court reviews limitless appeals from parents challenging the termination of their parental rights. It is very easy to read the opening line in this case, stating this case concerns a parent's appeal "from the termination of her parental rights to her seventh biological child" and have little faith that this case is any different from those that have come before. Nevertheless, *this* case shows a mother who has taken the all of the necessary steps to change her life for the better, for both herself and A.H. Given all that she has accomplished, it is patently unfair to ignore her progress because of her unfortunate history, particularly in light of the fact that there was no evidence that this child was in any imminent danger from the mother. Past performance is of course indicative of potential future behavior, but it is not all that courts must consider, especially considering the constitutionally protected parent-child relationship. Children simply are not entitled to perfect parents because there is no such thing.

Because the State failed to prove the statutory grounds for termination, we reverse the juvenile court's termination of the mother's parental rights.

Accordingly, we remand to the juvenile court for further proceedings including, if necessary, the implementation of reasonable services.

**REVERSED AND REMANDED.**