**IN THE COURT OF APPEALS OF IOWA**

No. 16-0634
Filed August 17, 2016

**IN THE INTEREST OF A.M.C.,**
**Minor Child,**

**A.C., Mother,**
Appellant.
_____

Appeal from the Iowa District Court for Dickinson County, David C. Larson, District Associate Judge.

A mother appeals the termination of her parental rights to her child. **AFFIRMED.**

Michael H. Johnson of Johnson Law Firm, Spirit Lake, for appellant.

Thomas J. Miller, Attorney General, and Kathryn K. Lang, Assistant Attorney General, for appellee State.

Shannon L. Sandy of Sandy Law Firm, P.C., Spirit Lake, for minor child.

Considered by Danilson, C.J., and Vaitheswaran and Tabor, JJ.

**TABOR, Judge.**

The juvenile court terminated a mother's parental rights to her three children—ages nine, seven, and five. On appeal, she only challenges the court's decision regarding the youngest child, A.M.C. The juvenile court relied on Iowa Code section 232.116(1)(f) (2015) as the basis for termination. The mother argues the State did not prove the statutory grounds by clear and convincing evidence. Additionally, the mother asserts the State did not exert reasonable reunification efforts. Finally, the mother claims termination is not in the best interests of the child. Because the State offered ample evidence A.M.C. could not be returned to his mother's care and termination offered him the best chance at long-term nurturing and growth, we affirm.

## I.      Background Facts and Proceedings

A.M.C. lived with his mother, sister, and brother before 2014. The mother was divorced from the children's father, and the father had little to no involvement with the children. The family first came to the attention of the Iowa Department of Human Services (DHS) in 2012 because the mother was alleged to have used methamphetamine and marijuana in the home while A.M.C. and his siblings were sleeping. Following this incident, the mother received voluntary substance abuse treatment until the DHS deemed the issue resolved in late 2013.

In April 2014, the father took his own life. Following the death of the father, the mother increasingly struggled with her mental health, and the DHS workers believed she was no longer able to care for her children. In July 2014, A.M.C. and his brother were voluntarily placed with their maternal aunt after being found unattended outdoors while their mother was home sleeping,

unaware they were missing. A.M.C.'s sister was living with the grandmother. The mother moved in with her mother in November 2014 after losing her mobile home.

On December 3, 2014, the voluntary placement became court ordered when A.M.C. and his siblings were adjudicated as children in need of assistance (CINA). During the pendency of the CINA proceeding, the DHS became aware that A.M.C. and his brother were sexually abused by their maternal uncle. Following the abuse, A.M.C. displayed inappropriate sexual behavior and had difficulty trusting others. A.M.C. requires special care because of these concerns—including near constant supervision and reinforcement of proper behavior.

The mother underwent a psychological evaluation in January 2015, at which point she was diagnosed with bipolar disorder, posttraumatic stress disorder, and borderline personality disorder. The evaluator noted a belief the mother would continue to struggle to put the children's needs before her own due to these mental health issues. The DHS provided services to help the mother improve her mental health.

A.M.C. and his brother remained with their aunt until she requested the boys be removed from her home in April 2015. This request was spurred by sexual acts and violent behavior between A.M.C. and his brother. Thereafter, A.M.C. was placed with a foster family, with whom he has remained. During this time, the mother was offered a variety of services including, but not limited to, phone calls with A.M.C., individual weekly supervised visits with A.M.C., transportation to those visits, parenting classes, and mental health services.

During the time leading up to the termination, the mother missed or was late to a number of visits and scheduled phone calls with A.M.C. The mother often refused to adjust her personal schedule to make time for visits with the children. During the visits the mother did attend, she struggled to apply the parenting skills she had been taught in the classes provided by the DHS. Following visits and phone calls with the mother, A.M.C. would often become upset easily, disobey his foster parents, and misbehave in school.

At the time of the termination proceedings, the mother had a paramour in Minnesota, where she intended to move in the near future. The mother would not provide the DHS with her paramour's personal information.

The juvenile court held a termination hearing in January 2016. The court issued an order terminating the rights of the mother to all three children on January 27, 2016, under section 232.116(1)(f). The mother now appeals the termination of her rights to A.M.C.[1]

## II.     Standard of Review

We review termination proceedings de novo. *In re M.W.,* 876 N.W.2d 212, 219 (Iowa 2016). "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *Id.* (quoting *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010)). Clear and convincing evidence must support the termination. *Id.* Evidence is clear and convincing when we have no serious or substantial doubts as to the correctness of conclusions of law drawn from it. *Id.*

---

[1] The State filed a response to the mother's petition on appeal and the guardian ad litem for the child joined in that response.

## III.  Analysis

"Our review of termination of parental rights under Iowa Code Chapter 232 is a three-step analysis." *M.W.*, 876 N.W.2d at 219.  First, we must determine whether the State established the statutory grounds for termination, here section 232.116(1)(f), by clear and convincing evidence.  *See id.*  If statutory grounds are established, we next consider whether termination is in the child's best interests under section 232.116(2).  *See id.* at 219-20.  Finally, we determine whether any exceptions contained in section 232.116(3) outweigh termination.  *See id.* at 220.

**Statutory Grounds.**  The mother argues the State failed to prove by clear and convincing evidence A.M.C. could not be returned to her custody, as required by section 232.116(1)(f)(4).[2]  She concedes she cannot presently take care of all three children at the same time but contends she is able to adequately care for A.M.C. alone.  We conclude the State offered clear and convincing evidence to satisfy the statutory requirements of section 232.116(1)(f).

A.M.C.'s special needs require above-average parenting skills.  A.M.C.'s therapist testified A.M.C.'s vulnerability requires him to live in a stable and predictable environment in order to continue improving his mental health and trust issues.  Despite the services provided by the DHS to improve the mother's parenting skills, she has not attained the skills to satisfy A.M.C.'s needs.  While

---

[2] Iowa Code section 232.116(1)(f) states the juvenile court may terminate the rights of a parent to a child if:

> (1) [t]he child is four years of age or older, (2) [t]he child has been adjudicated a CINA pursuant to section 232.96, (3) [t]he child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days, and (4) [t]here is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

The mother does not dispute the first three elements—she argues the State failed to prove the fourth element.

A.M.C. has made significant headway in addressing his mental health during his time with his foster parents, his foster parents consistently observed regression in his behavior following his mother's visits. The mother continues to struggle to understand A.M.C.'s need for intensive supervision and reinforcement of proper behavior.

The mother's struggle with her own mental health has affected her ability to provide adequate care for her children in the past. The mother's psychological evaluator stated it would likely be difficult for her to put the needs of her children above her own due to her mental health diagnoses. Therefore, we agree with the juvenile court's assessment that the mother has not adequately addressed her mental health needs or improved her parenting skills so as to be able to provide the special care necessary to nurture the emotional welfare of A.M.C. *See In re A.M.S.,* 419 N.W.2d 723, 734 (Iowa 1988) (finding it unlikely mother with mental disability could improve her parenting skills to meet special needs of daughter).

Furthermore, the mother has not put forth a significant effort to maintain financial stability. In the year leading up to the termination hearing, the mother primarily worked part-time and had not saved sufficient funds to provide for A.M.C. The mother did not have her own housing and did not take advantage of the DHS services offered to assist her in obtaining independent housing. The mother currently lives with the children's grandmother and A.M.C.'s sister. It is unclear how A.M.C. would interact with his sister given his inappropriate behavior following the sexual abuse he experienced. Moreover, the mother often had difficulty securing reliable transportation. The mother seemed unable to

understand emergencies requiring transportation may arise when caring for a child and to understand she would be responsible for transporting A.M.C. to therapy, additional doctor's appointments, and other activities.

The mother has had significant time to improve her parenting skills and place herself in a position to provide adequate care for A.M.C., but she has not reached that level of stability. While there are no allegations A.M.C. suffered intentional physical abuse at the hands of his mother, the record demonstrates a number of instances of neglect. Our statutory termination provisions being both preventative and remedial, the State need not wait until tangible harm has occurred before initiating a termination. *See In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006). Given the high probability of imminent harm and continued neglect, we find clear and convincing evidence A.M.C. could not be safely placed in his mother's care at the time of the hearing. *See id.* Consequently, termination was proper under subsection (f). *See* Iowa Code § 232.116(1)(f).

**Reasonable Efforts.** The DHS is required to "make every reasonable effort to return the child to the child's home as quickly as possible consistent with the best interests of the child." Iowa Code § 232.102(7); *In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000). In turn, the parent must ask for additional services before permanency or termination proceedings if they believe the current services to be inadequate. *In re A.A.G.,* 708 N.W.2d 85, 91 (Iowa Ct. App. 2005); *see also* Iowa Code § 232.99(3). Consequently, to preserve for appeal the challenge that DHS failed to use reasonable efforts toward reunification, the parent must have demanded a change in the services. The record indicates the mother requested

additional and unsupervised visitation time with A.M.C. Because she sought additional services, the mother preserved her claim for appeal.

The State's duty to make reasonable efforts toward reunification is not "a strict substantive requirement of termination." *C.B.*, 611 N.W.2d at 493. "Instead, the scope of the efforts by the DHS to reunify parent and child after removal impacts the burden of proving those elements of termination which require reunification efforts." *Id.*

While visitation is imperative in achieving reunification, its nature and extent is always controlled by the best interest of the child. *In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996). Before visits, A.M.C. was often anxious and needed reassurance he would be returning to his foster family. The mother was often distracted and did not make significant efforts to engage A.M.C. during their visits. She did not employ the skills she was taught through parenting education without prompts from supervisors. She often arrived late, and at times, did not show up for scheduled visits. During one visit in particular, A.M.C. was swimming with his mother when he suddenly became visibly upset, jumped out of the pool, and ran to the bathroom. When his foster mother inquired about his distress, A.M.C. said his mother inappropriately touched him while swimming. Following visits with his mother, A.M.C.'s foster parents reported he was often angry, destructive, and noncompliant.

The DHS provided the mother with a number of services, including but not limited to, supervised visits, parenting-skills education, and therapy. Considering the mother's poor connection with A.M.C. during visits and A.M.C.'s behavioral

regression following visits, the DHS appropriately limited the mother's visits and made reasonable efforts to reunite her with her child. *See id.*

**Best Interests and Factors Weighing Against Termination.** The mother argues termination of her rights will sever the bond between A.M.C. and his siblings. The mother further argues termination would be detrimental to A.M.C. due to the close parent-child bond. *See* Iowa Code § 232.116(3)(c).

In determining the best interests of the child, we give primary consideration to the child's safety, to the best placement for furthering his long-term nurturing and growth, and to his physical, mental, and emotional condition and needs. Iowa Code § 232.116(2); *see also D.W.*, 791 N.W.2d at 708. We agree with the juvenile court's conclusion the child's needs are best served by moving toward adoption.

First, we address the mother's contention that it is not in the best interests of the siblings to be separated from each other. Our supreme court has expressed a preference to keep siblings together if possible. *In re L.B.T.*, 318 N.W.2d 200, 202 (Iowa 1982). But, that preference does not outweigh the consideration of the best interests of the individual child. *Id.* Here, A.M.C. and his brother displayed inappropriate sexual behavior toward one another when living together. The two boys were separated as a result of this behavior, and reports from DHS workers indicate the risk of harm would return if they were again in each other's company without proper supervision. Given the dynamics of the sibling relationships in this case, it is not counter to A.M.C.'s interests to separate him from his brother. Furthermore, the mother's rights have been

terminated as to A.M.C.'s siblings, and as such, the three children would not have a legal relationship even if A.M.C. were returned to his mother's custody.

Finally, we do not find the closeness of A.M.C.'s relationship with his mother outweighs his need for permanency. The mother's current lack of independent housing and plan to relocate to Minnesota in the near future to live near her paramour do not coincide with A.M.C.'s need for a consistent and safe home. Further, A.M.C. was often fearful when faced with the prospect of returning to his mother's care and reluctant to speak to his mother on the phone. During supervised visits, A.M.C. routinely chose to engage his foster mother rather than his biological mother. After visits with his mother, A.M.C. exhibited aggressive and inappropriate behavior. A.M.C.'s behavior and mental health has significantly improved since placement with his foster family. A.M.C. calls his foster parents "mom" and "dad" and has voiced his desire for his foster family to be his "forever family." His foster family has expressed the intent to move forward with adoption. While the mother shares a bond with A.M.C., we do not find termination would be detrimental to A.M.C. due to the closeness of this bond.

**AFFIRMED.**